UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------------x
LUIS DOMINGUEZ, TEODORO SANTOS MORENO,                    Civil Action No.:
FRANCISCA SOLIS ORDUNA, EMMANUEL RODRIGUEZ QUINTANA,    23-cv-1372
ERASTO QUINTANA CRISANTOS, and MARIA FLOR SOLIS ORDUNA

On behalf of themselves,

    Plaintiffs,

    v.

MEGA MART LLC, d/b/a CHESTNUT SUPERMARKET,
MENACHEM ABRAMOWITZ, JOEL EPSTEIN,
MOSHE LANDAU, and YECHEZKEL S NOIMAN AKA CHESKY NEIMAN
in their individual and professional capacity

    Defendants, jointly and severally.
-------------------------------------------------------------------------------------x

> **COMPLAINT
> WITH JURY
> DEMAND**

Plaintiffs LUIS DOMINGUEZ ("Plaintiff Dominguez"), TEODORO SANTOS MORENO ("Plaintiff Moreno"), FRANCISCA SOLIS ORDUNA ("Plaintiff Orduna"), EMMANUEL RODRIGUEZ QUINTANA ("Plaintiff Quintana"), ERASTO QUINTANA CRISANTOS ("Crisantos"), and MARIA FLOR SOLIS ORDUNA ("Plaintiff Solis"), (collectively "Plaintiffs") by and through the undersigned counsel Kristina Mazzocchi, ESQ., The Law Offices of Kristina Mazzocchi, and Megan Goddard, ESQ., of Goddard Law PLLC, as and for their Complaint against Defendant MEGAMART LLC d/b/a Chestnut Supermarket ("Chestnut Supermarket"), MOSHE LANDAU ("Defendant Landau"), JOEL EPSTEIN ("Defendant General Manager Epstein"), MENACHEM ABRAMOWITZ ("Defendant Mendy Abramowitz") and YECHEZKEL S NOIMAN AKA CHESKY NEIMAN ("Defendant Chesky") (collectively "Defendants") hereby alleges as follows:

## NATURE OF ACTION

1.    Plaintiffs bring this action to redress the hostile and discriminatory work environment that they were subjected to at Chestnut Supermarket in Brooklyn, New York.

2.      Although Chestnut Supermarket purports to be a grocery store, upon information and belief, it also acts as a Money Lender, and customers come to the Grocery Store to take out cash loans from Chestnut Supermarket and/or its individual owners.

3.      Chestnut Supermarket routinely discriminates against, mistreats and abuses its employees on account of their race, religion, gender, national origin and citizenship status.

4.      Chestnut Supermarket openly endorses and allows sexual harassment against its staff.

5.      Chestnut Supermarket also engages in outrageous unfair pay practices, including failing to pay overtime, failing to allow breaks and failing to pay employees in a legal manner.

6.      Employees who speak out against the unlawful and unfair employment practices at Chestnut Supermarket suffer severe retaliation.

7.      Upon information and belief, the Chestnut Supermarket Defendants routinely and purposefully hire individuals who they perceive as non-citizens, whom they believe are less likely to know their civil rights, and less likely to take action against them for their unlawful employment actions, and whom they threaten to "have deported" if they dare to object.

8.      Upon information and belief, the Chestnut Supermarket Defendants negligently hire and negligently retain Managers and Supervisors who openly sexually harass and discriminate against employees, who assault, batter and falsely imprison employees, and who openly retaliate against employees who object to unlawful behavior.

**Chestnut Supermarket Relies on the Shomrim**

9.      Upon information and belief, the Defendants rely on the Shomrim, a local neighborhood volunteer group to "police" the store instead of the New York Police Department ("NYPD").

10.     Also, according to Wikipedia, while the expectation is for Shomrim to notify police, this is done in some cases but not in others. Former New York City Police Commissioner Raymond Kelly has publicly stated that Shomrim does not immediately notify police when a call comes in.[1]

11.     Upon information and belief, the Defendants use the Shomrim to enforce their unlawful employment practices and to scare employees into submission, *infra*.

**Plaintiffs Are Terrorized, Falsely Accused of Stealing and Terminated**

12.     Plaintiffs, who needed to earn a living to support themselves and their families, put up with the outrageous abuse as long as they could, but on or about April 5, 2022 the abuse became too outrageous. Upon information and belief and according to statements by Defendant Epstein to Plaintiffs, on that date, a customer who had just taken a cash loan from Chestnut Supermarket's money lending business, allegedly misplaced the large amount of cash she had just borrowed and became extremely upset.

13.     Defendants without investigation, immediately decided that their Hispanic employees must have stolen the cash and locked Plaintiffs Orduna, Quintana and Crisantos (collectively referred to as the "Wrongly Accused Plaintiffs") in their management offices and screamed at and accused them of stealing the missing cash.

14.     Defendant Manager Epstein told the Wrongly Accused Plaintiffs, that he had given this cash "charity" to a female shopper and that she left the cash in the bathroom. He further explained that he saw on videotape that Plaintiffs had each used the bathroom in or around the time that some mystery shopper left the money behind.

---

[1] https://en.wikipedia.org/wiki/Shomrim_(neighborhood_watch_group)#cite_note-chronicle-8

15.     Specifically, Defendant Manager Epstein shouted that Plaintiffs had conspired to steal cash in the amount of $1400 then changed the amount to $1500 and then again to $1700.

16.     That is, Defendants accused Wrongfully Accused Plaintiffs of Felony Larceny, *infra.*

17.     When the Wrongly Accused Plaintiffs bewilderingly told their captors that they did not steal anything, they were berated, called names, assaulted and battered.    Eventually, Defendants insisted on strip searching them and demanded that they each take off portions of their clothes in front of everyone in the room, their bodies and belongings were searched while they remained imprisoned against their will.

18.     Throughout the ordeal, Defendants repeatedly threatened the Wrongly Accused Plaintiffs that if they did not "confess" to the crime, they would be arrested by ICE and "deported back to Mexico."

19.     While the Wrongly Accused Plaintiffs were locked in Management's office against their will, Defendant General Manager Epstein demanded that each Wrongly Accused Plaintiff remove their clothing. When Plaintiff Orduna refused to take her clothes on in front of a room full of men, Defendant General Manager Epstein screamed, "You fucking bitch, take off your clothes fucking bitch" and when she still refused to do so, he physically took her phone, assaulted and battered her.

20.     Thereafter, the Wrongly Accused Plaintiffs were interrogated and threatened by the Neighborhood Watch Group known as the Shomrim as they waited for the actual NYPD.

21.     Defendants soon located the missing money, if it was missing at all, but not before engaging in criminal harassment and abuse of the Wrongly Accused Plaintiffs.

22.     The Wrongfully Accused Plaintiffs allege that they were unlawfully targeted in this way by Defendants on the basis of their protected statuses, leaving Plaintiffs victimized, defamed, humiliated, traumatized, constructively and/or actually wrongfully discharged.

23.     That is, Defendants caused a malicious, false and defamatory statement of slander *per se* to be published of and concerning Plaintiffs. Defendants' statements regarding Plaintiffs' criminal activities were false, and Defendants have subjected Plaintiffs to fear, disgrace, humiliation, shame and constant anxiety and loss of jobs, by falsely accusing and portraying Plaintiffs as criminals, *infra*.

24.     Plaintiffs bring this action seeking a remedy for the harm to Plaintiff's reputations because of Defendants' malicious and false statements, and imputing of criminal activity to Plaintiffs.

25.     Plaintiffs Orduna, Crisantos and Quintana seek remedy for Defendants' intentional infliction of emotional distress to Plaintiffs because of Defendants' defamatory statement and other tortious and discriminatory conduct, which shocks the conscience and has caused Plaintiffs to suffer severe emotional distress.

26.     Plaintiffs Orduna, Crisantos and Quintana bring an action for violations for the torts of defamation, false imprisonment. Plaintiffs Dominguez, Orduna, Crisantos and Quintana bring actions of assault, with Orduna and Rodrigiuez bringing an addtional action of battery for the wrongful and unwanted touchings by Defendant Epstein.  All Plaintiffs brin an action of negligent hiring and retention, and negligent and/or intentional infliction of emotional distress.

27.     Plaintiff Orduna on her own behalf under the New York City Gender Motivated Violence Act, N.Y.C. Admin, Code § 8-903 (2017) for the assault and battery she was subjected

to which was motivated (i) by her gender; (ii) on the basis of her gender; and/or (iii) due, at least in part, to an animus based on her gender.

28.    All Plaintiffs further bring an action to redress unlawful national origin discrimination and discrimination based on actual or perceived immigration status, with all Plaintiffs bringing a sexual harassment Hostile Work Environment claim pursuant to Section the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, et seq. ("NYCHRL") seeking monetary, declaratory and injunctive relief.

29.    All Plaintiffs bring an action under The New York Equal Pay Act for the disparate pay they were subjected to based on their race and/or national origin, and/or gender *infra.*

30.    Plaintiffs Dominguez, Moreno, Orduna and Solis also bring this action to recover minimum wage and/or overtime, unlawful deductions and penalties for failure to provide proper wage notices and wage statements pursuant to FLSA, 29 U.S.C. § 207 ("FLSA") and the New York Labor Law ("NYLL"), §§ 650 et seq..

31.    Defendants by these acts engaged in intentional discrimination because of their protected statuses, willfully paid Plaintiffs unlawfully, subjected all Plaintiffs to disparate rules, pay and to physical and/ or egregious emotional injury on account of their intentional, negligent and/or reckless disregard for Plaintiffs' rights guaranteed under local, state and federal law.

32.    Although Defendants possessed full knowledge of all such acts of violence, harassment, discrimination, unfair labor and wage practices, no actions were taken to remedy such, or to comply with annual anti-sexual harassment training mandated by the City and State.

33.    Through the Chestnut's retention of supervisors and Managers whom they knew to be harassing, discriminatory, who commit torts against Plaintiffs, and who actively retaliate against

employees for objecting to unlawful employment practices, the Company condoned, and aided and abetted such acts in violation of the NYCHRL, *infra*.

34.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL and other laws, all Plaintiffs have each suffered, and continue to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence, familial, marital issues and loss of enjoyment of life.

35.     Further such acts that warrant an award of punitive damages.

## JURISDICTION

36.     Jurisdiction is proper as this Court has original federal question jurisdiction under 28 U.S.C. § 1331 since this case is brought under the FLSA, 29 U.S.C. § § 201, et seq.  This Court has supplemental jurisdiction over the NYLL claims and Plaintiffs' individual claims, as they are so related that they form part of the same case or controversy under Article III of the United States Constitution and are properly before this court pursuant to 28 U.S.C. § 1367.

37.     As stated below, Defendants are an employer engaged in commerce as defined in the FLSA, 29 U.S.C. § 203 (s).

38.     Defendants are subject to personal jurisdiction in the State of New York since they are located in Kings County, State of New York and do business in this state.

39.     Venue is proper in this District because Defendants conducts business in this Judicial District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## PARTIES

*Plaintiffs*

40.    Plaintiff Luis Dominguez ("Plaintiff Dominguez") is a Hispanic Male of Ecuadorian national origin. Plaintiff Dominguez is a resident of Queens County. Plaintiff was jointly employed by Defendants from on or about June 2, 2019, to on or about May 13, 2022. At all times relevant Defendants perceived Dominguez as an immigrant. At all times relevant he worked approximately 45-70 hours a week.

41.    Plaintiff Teodoro Santos Moreno ("Plaintiff Moreno") is a Hispanic Male of Mexican national origin. Plaintiff Moreno is a resident of Kings County. Plaintiff Moreno was jointly employed by Defendants from in or around September 2020 until on or around April 5, 2022. At all times relevant Defendants perceived Moreno as an immigrant. At all times relevant he worked approximately 64-70 hours a week.

42.    Plaintiff Francisca Solis Orduna ("Plaintiff Orduna") is a Hispanic Female of Mexican national origin.  She is a resident of Kings County. Plaintiff Orduna was jointly employed by Defendants from in or about January 2021 to on or about April 5, 2022. At all times relevant Defendants perceived Orduna as an immigrant. At all times relevant she worked approximately 55-70 hours a week.

43.    Plaintiff Emmanuel Quintana ("Plaintiff Quintana") is a Hispanic Male of Mexican national origin.  He is a resident of Kings County. Plaintiff Quintana was employed by Defendants from in or about Summer of 2021 to on or about April 5, 2022. At all times relevant Defendants perceived Quintana as an immigrant and or a person who did not have American citizenship. At all times relevant he worked approximately 40-50 hours a week.

44.     Plaintiff Erasto Quintana ("Plaintiff Crisantos") is a Hispanic Male of Mexican national origin.  He is a resident of Kings County. Plaintiff Crisantos was employed by Defendants from in or about January 2013 to on or about April 5, 2022. At all times relevant Defendants perceived Quintana as an immigrant. At all times relevant he worked approximately 40-50 hours a week.

45.     Plaintiff Maria Flor Solis Orduna ("Plaintiff Solis") is a Hispanic Female of Mexican national origin.  She is a resident of Kings County. Plaintiff Orduna was jointly employed by Defendants from in or about October 2017 to on or about July 2021. At all times relevant Defendants perceived Solis as an immigrant. At all times relevant she worked approximately 90-115 hours a week.

### *Defendants*

### **Defendant Chestnut**

46.     Upon information and belief, Defendant Mega Mart LLC, d/b/a Chestnut Supermarket, ("Chestnut") is a privately held kosher food chain retailer.

47.     Upon information and belief, Defendant Mega Mart LLC, d/b/a Chestnut Supermarket, is headquartered 146 Spencer Street, Suite 2006, Brooklyn NY 11205.

48.     Chestnut Supermarket, at all times relevant, is/was Supervisor/Manager Joel Epstein's employer.

49.     Chestnut Supermarket, at all times relevant, is/was Supervisor/Manager Sam Guachiak's employer.

50.     Upon information and belief, Chestnut Supermarket, at all times relevant, jointly owns and operates Chesky's Deli, located in Chestnut Supermarket.

51.     At all times relevant, Defendant Chestnut was Plaintiffs' employer as defined by the FLSA, NYLL and NYCHRL.

52.     Defendant Chestnut has been at all times engaged in commerce within the meaning of the FLSA.

53.     Upon information and belief, Defendant Chestnut is an enterprise whose annual gross volume of sales made, or business done, is in excess of $500,000. Specifically, Defendant Chestnut is a thriving Kosher retail chain supermarket and is one of many owned and operated by Defendant Moshe Landau.

54.     Upon information and belief, Defendant Chestnut regularly conducted interstate business.

55.     At all times relevant Defendant Chestnut Supermarket has been subject to the training and policy maintenance requirements of the New York City Human Rights Law.

**Defendant Moshe Landau**

56.     Upon information and belief, and at all times relevant, and at present, Defendant Moshe Landau is the President, founder, owner and principal of Chestnut Supermarket.

57.     Upon information and belief, and at all times relevant, and at present, Defendant Landau resides in Brooklyn, New York.

58.     Upon information and belief, and at all times relevant, and at present, Defendant Landau performed work in Kings County at the headquarters of Chestnut Supermarket.

59.     At all times relevant, Defendant Landau was an operator, manager, principle, owner and an individual engaged in active management of the day-to-day business operation at Chestnut Supermarket.

60.     At all times relevant herein, Defendant Landau exercised and retained control over all aspects of the day-to -day function of Chestnut Supermarket, including: (i) operational control over the operational enterprise, including actively managing, supervising, and directing the business operations; (ii) power to establish, and did establish, the terms of employment of Plaintiffs and others similarly situated; (iii) power to hire and fire; (iv) control over employee work schedules; (v) the ability to determine the rate and method of employee compensation; and (vi) maintenance employment records of defendants Chestnut Supermarket.

61.     At all times relevant Defendant Moshe Landau had supervisory and managerial control over Defendant Supervisor/Manager Joel Epstein and Plaintiffs.

62.     At all times relevant herein, Defendant Landau acted directly and indirectly in the interest of Chestnut Supermarket in relation to their employees, including Plaintiffs.

63.     At all times relevant herein, Defendant Landau had the authority to supervise the employees, including Plaintiffs, at Chestnut Supermarket and all other related premises where Plaintiffs performed duties for defendants.

64.     At all times relevant herein, Defendant Landau had the authority to and actually did direct employees, including Plaintiffs, at Chestnut Supermarket and all premises where Plaintiffs performed duties for defendants.

65.     At all times relevant herein, Defendant Landau had the authority to hire and fire the employees, including Plaintiffs, of Chestnut Supermarket.

66.     At all times relevant herein, Chestnut Supermarket had the authority to make decisions about the workplace duties and hours of employees, including Plaintiffs, at Chestnut Supermarket.

67.    At all times relevant herein, Defendant Landau had the authority to make decisions about the compensation of employees, including Plaintiffs, at Chestnut Supermarket.

68.    At all times relevant herein, Defendant Landau had the authority to act with respect to

supervising, directing, hiring and firing, making decisions about workplace duties and hours and making decisions about pay of defendants' employees, including Plaintiffs.

69.    At all times relevant herein, Defendant Moshe Landau, aided and abetted all such alleged illegal wage practices, discriminatory acts and torts suffered by Plaintiffs.

**Defendant Joel Epstein**

70.    Defendant Joel Epstein (hereafter "Defendant General Manager Epstein") is a male adult resident of Brooklyn, New York.

71.    Upon information and belief, and at all times relevant, since at least January 2013, Defendant General Manager Epstein had and did exercise managerial and supervisory control over Plaintiffs.

72.    Upon information and belief, and at all times relevant, since at least January 2013, and at present, Defendant General Manager Epstein has been the General Manager of Chestnut Supermarket.

73.    At all times relevant, Defendant General Manager Epstein is and was an employee of Chestnut Supermarket.

74.    Defendant General Manager Epstein regularly sexually harassed both his male and female subordinates.

75.    Defendant General Manager Epstein had an "English Only rule," which applied only to Hispanic employees and any time he heard any employee speaking Spanish snapped

angrily, "I hate that shit. Don't speak Spanish. don't sing in Spanish don't speak to me in Spanish – I hate that shit."

76.     Upon information and belief, Defendants continue to wrongfully retain Defendant General Manager Epstein even though he is known to discriminate against, sexually harass, assault and batter, defame and falsely imprison employees.

**Defendant "Chesky" Neiman**

77.     Upon information and belief, Defendant Chesky Neiman (hereafter "Defendant Chesky Neiman") is an adult male resident of Brooklyn, New York.

78.     Upon information and belief, and at all times relevant, Defendant Chesky Neiman with Defendant Moshe Landau and Chestnut Supermarket, jointly owns and operates owns a Deli Counter at the Chestnut Supermarket called "Chesky's Deli."

79.     Upon information and belief, and at all times relevant, and at present, Defendant Chesky performed work in Kings County at Chestnut Supermarket.

80.     At all times relevant, Defendant Chesky and Defendant Moshe Landau jointly operated, managed, jointly owned and an individual engaged in active management of the day-to-day business operation at Chesky's located in Chestnut Supermarket.

81.     At all times relevant herein, Defendant Chesky and Defendant Moshe Landau jointly exercised and retained control over all aspects of the day-to -day function of Chesky's deli located in Chestnut Supermarket, including: (i) operational control over the operational enterprise, including actively managing, supervising, and directing the business operations; (ii) power to establish, and did establish, the terms of employment of Plaintiffs and others similarly situated; (iii) power to hire and fire; (iv) control over employee work schedules; (v) the ability to determine

the rate and method of employee compensation; and (vi) maintenance employment records of defendants Chesky Deli located in Chestnut Supermarket.

82.     At all times relevant Defendant Chesky Neiman and Defendant Moshe Landau jointly had supervisory and managerial control over Plaintiffs.

83.     At all times relevant herein, Defendant Chesky Neiman acted directly and indirectly in the interest of Chestnut Supermarket in relation to their employees, including Plaintiffs.

84.     At all times relevant herein, Defendant Chesky Neiman had the authority and did supervise the Plaintiffs and other employees in Chestnut Supermarket.

85.     At all times relevant herein, Defendant Chesky Neiman had the authority to and actually did direct employees, including Plaintiffs, at Chestnut Supermarket.

86.     At all times relevant herein, Defendant Chesky Neiman had the authority to hire and fire the employees, including Plaintiffs, of Chestnut Supermarket.

87.     At all times relevant herein, Defendant Chesky Neiman had the authority to make decisions about the workplace duties and hours of employees, including Plaintiffs, at Chestnut Supermarket.

88.     At all times relevant herein, Defendant Chesky Neiman jointly with Defendant Moshe Landau had the authority to make decisions about the compensation of employees, including Plaintiffs, at Chestnut Supermarket.

89.     At all times relevant herein, Defendant Chesky had the authority to act with respect to supervising, directing, hiring and firing, making decisions about workplace duties and hours and making decisions about pay of defendants' employees, including Plaintiffs.

90.     At all times relevant herein, Defendant Chesky Neiman, aided and abetted all such alleged illegal wage practices, discriminatory acts and torts suffered by Plaintiffs.

## FACTUAL ALLEGATIONS

91.     Chestnut Supermarket is a large kosher chain supermarket retailer in Williamsburg, Brooklyn and upon information and belief was founded by Defendant Moshe Landau in or around September 16, 2009.

92.     Upon information and belief, Defendant Moshe Landau also owns and operates other kosher supermarkets in or around the New York tri-state area, including but not limited to Landaus in South Fallsburg, New York.

93.     Throughout the relevant period, all Plaintiffs worked for Defendants primarily at the Defendant's Myrtle Avenue location, however both Plaintiff Crisantos and Quintana worked at the South Fallsburg location at various times during their employment with Defendants.

### Plaintiffs Hire by Defendants

Plaintiff Crisantos

94.     In or around, January 2013, Plaintiff Crisantos, then 19 years old, arrived in New York City from Mexico.

95.     His brother was working for Defendants and encouraged Plaintiff Crisantos to work with him at Chestnut Supermarket.

96.     Thus, days after arrival, Plaintiff Crisantos stopped by Chestnut and inquired about a job and was immediately hired by Defendants to work as a "stocker" at the Chestnut Supermarket in Brooklyn, NY.

97.     Although at times he worked "up in the mountains" at the South Fallsburg, New York location during the early years of his employment, he mainly worked at the Brooklyn location throughout his tenure.

98.    At all times relevant, Crisantos was instructed to "punch in" using a finger print punch in clock located by the employee entrance of the supermarket.

99.    During the relevant period, Plaintiffs worked at all times alongside non-Mexican and/or non-actual or perceived immigrant Chestnut Supermarket employees whom received better treatment non-discriminatory treatment and pay than Plaintiffs on account of their national origin and/or perceived non-immigrant status.

100.    At all times relevant, Defendant Moshe Landau and Defendant Joel Epstein all directly managed and supervised Plaintiff Crisantos.

Plaintiff Solis

101.    In or around October 2017, Plaintiff Solis heard that there was an open position at Chestnut Supermarket at Chesky's deli counter.  She was excited to be offered a full-time job.

102.    At all times relevant, Solis was instructed to "punch in" using a finger print punch in clock located at the entrance of the supermarket.

103.    At all times relevant and for her entire tenure working for Chestnut Supermarket, Plaintiff Solis worked approximately 90-115 hours a week.

104.    At all times relevant and for her entire tenure working for Chestnut Supermarket, Plaintiff Solis was paid a straight time hourly rate, in <u>cash</u> per hour with no overtime premium paid after 40 hours.

105.    That is from in or around October 2017 to on or about January 2019, Plaintiff Solis was paid a straight time hourly rate of $16.00, in <u>cash</u> per hour with no overtime premium paid after 40 hours; from in or around January 2019 to on or about January 2020 Plaintiff Solis was paid a straight time hourly rate of $18.00, in <u>cash</u> per hour with no overtime premium paid after

40 hours; and from in or around January 2020 to July 2021, Plaintiff Solis was paid a straight time hourly rate of $20.00, in <u>cash</u> per hour with no overtime premium paid after 40 hours.

106.    Further, at all times relevant and for her entire tenure working for Chestnut Supermarket, she was not provided wage statements or wage notices.

107.    During the relevant period, Plaintiffs worked at all times alongside non-Mexican and/or non-actual or perceived immigrant Chestnut Supermarket employees whom received better treatment non-discriminatory treatment and pay than Plaintiffs on account of their national origin and/or perceived non-immigrant status.

108.    At all times relevant, Defendant Chesky Nieman, Defendant Joel Epstein and Defendant Moshe all directly managed and supervised Plaintiff Solis.

109.    In or around July 2021, Plaintiff Solis was constructively discharged based on the overt hostile work environment inclusive of wage theft and the constant sexual harassment she so endured.

<u>Plaintiff Dominguez</u>

110.    Plaintiff Dominguez was hired by Defendant Joel Epstein to work as a Chestnut Supermarket cashier from on or about June 2, 2019 for $15.00/hour.

111.    At all times relevant, Dominguez was instructed to "punch in" using a finger print punch in clock located by the employee entrance of the supermarket .

112.    At all times relevant and for his entire tenure working for Chestnut Supermarket, Plaintiff Dominguez worked approximately 45 hours a week.

113.    However, during the Jewish holidays his hours would increase and at times he would work approximately 70 hours a week.

114.    Although Plaintiff Dominguez punched in using his fingerprint, he was never provided with time or wage statements.

115.    Based on various discussions with Chestnut employees, he came to learn that Hispanics were paid approximately $5-$10.00 less per hour than non-Hispanic non-immigrant workers.

116.    For the first three weeks of Plaintiff Dominguez's employment, once a week he was handed an envelope with cash in it. The envelope was void of any paystub or detailed wage statement. There just was cash in an envelope with his name written on it.

117.    The money never added up correctly and Plaintiff Dominguez was underpaid each time.

118.    In turn, Plaintiff Dominguez would approach various Managers including Manager Sam Guachiak, Jason (LNU), Defendant Mendy Abramowitz and Defendant Joel Epstein about the money that was missing, and they would always say they couldn't help him.

119.    Finally, Plaintiff Dominguez approached the Chestnut Supermarket's Accountant and he too said that there was nothing he could do.

120.    Plaintiff Dominguez was terminated when he refused to lie in support of Defendants in relation to the instant lawsuit.

**<u>Defendants Force Employees to Cash Third Party Checks to Get Their Pay</u>**

121.    Equally alarming, Plaintiff Dominguez learned from first-hand experience that Defendants "paid" workers who were perceived as immigrant workers by giving them multiple third party checks in varying amounts that, upon information and belief, they received from customers tendered to Chestnut to pay for their accounts.  The checks were not written to the employees but they were expected to find a way to cash them.

122.    Approximately three weeks later, on pay day, Manager Sam Guachiak handed Plaintiff an envelope filled with several checks that customers had given to Defendants.  The checks were not written to Plaintiff Dominguez.

123.    The checks were from various individuals and entities written out to other individuals and entities in various amounts, none of which were made out to him nor to Chestnut Supermarket.

124.    Plaintiff Dominguez assumed that he was given these checks by mistake. After trying to return the checks to several managers , Defendant Joel Epstein told Plaintiff Dominguez that the checks were his pay and that he had to "figure it out."

125.    Plaintiff Dominguez approached Chestnut Supermarket's Accountant again. The accountant confirmed that the checks were "payment for [Plaintiff Dominguez's] work and that Chestnut Supermarket would not cash the checks for [him]. Plaintiff Dominguez was told that he "had to figure [out how to get the checks cashed  himself]." The Accountant further warned [him] not to tell anyone, including other workers, that [he] was being paid this way. Plaintiff Dominguez was scared but desperate to be paid for the work [he] performed.

126.    Not only did the checks never add up to what [he] was actually owed, but many of the checks also bounced which cost [him] even more money. It was also costly to cash these checks as [he] would have to pay someone to cash them for [him].

127.    That is from in or around October 2019 to on or about May 13, 2022, Plaintiff Dominguez was hardly paid at all. He did not receive wages paid to him for his labor. He only received checks not payable to him which he sometimes was able to cash and sometimes was not able to cash.

128.   The undersigned has in their possession copies of these third party checks tendered to Plaintiff Dominguez as pay for his work as a cashier at Chestnut Supermarket.

129.   Further, at all times relevant and for his entire tenure working for Chestnut Supermarket, he was not provided wage statements or wage notices.

130.   During the relevant period, Plaintiff worked at all times alongside non-Ecuadorian and/or non-actual or perceived immigrant Chestnut Supermarket employees whom received better treatment non-discriminatory treatment and pay than Plaintiffs on account of their national origin and/or perceived non-immigrant status.

131.   At all times relevant, Defendants Chestnut, Joel Epstein and Moshe Landau all directly managed and supervised Plaintiff Dominguez.

Plaintiff Moreno

132.   During the pandemic, in or around September 2020, Plaintiff Moreno was hired by Defendant Chesky to work at a deli counter in Chestnut Supermarket.

133.   Plaintiff Moreno had worked with Defendant Chesky in the past at a private kitchen located close to Chestnut.

134.   At all times relevant, Plaintiff Moreno was instructed to "punch in" using a finger print punch in clock located at the employee entrance of the supermarket.

135.   At all times relevant and for his entire tenure working for Chestnut Supermarket, Plaintiff Moreno worked approximately 64 hours a week and during the Jewish holidays he worked approximately 70 hours a week.

136.   At all times relevant and for his entire tenure working for Chestnut Supermarket, Plaintiff Moreno was paid a straight time hourly rate, $17.00 in cash per hour with no overtime premium paid after 40 hours.

137.    Further, at all times relevant and for his entire tenure working for Chestnut Supermarket, he was not provided wage statements or wage notices.

138.    During the relevant period, Plaintiff worked at all times alongside non-Mexican and/or non-actual or perceived immigrant Chestnut Supermarket employees whom received better treatment, non-discriminatory treatment and pay than Plaintiffs on account of their national origin and/or perceived non-immigrant status.

139.    At all times relevant, Defendant Chestnut, Defendant Chesky Nieman, Defendant Joel Epstein and Defendant Moshe all directly managed and supervised Plaintiff Moreno.

Plaintiff Orduna

140.    Plaintiff Francisca Solis Orduna had worked in and around Williamsburg Brooklyn for almost 20 years.

141.    She had even owned and operated her own business that unfortunately closed during the height of Covid due to shutdowns around the City.

142.    So when she learned of an opportunity to continue to work in the same community she loved, she was ecstatic.

143.    Plaintiff Orduna' s sister had been working for Chestnut Supermarket for several years and told Plaintiff Orduna that she could get a job there too if she applied.

144.    Indeed, in or around early January 2021, Plaintiff Orduna started her job at Chestnut Supermarket working at the Chesky's Deli Counter.

145.    At all times relevant, Orduna was instructed to "punch in" using a finger print punch in clock located at the entrance of the supermarket.

146.    At all times relevant and for her entire tenure working for Chestnut Supermarket, Plaintiff Orduna worked approximately 55 hours a week.

147.    For the first three months Orduna worked for Chestnut Supermarket, Plaintiff Orduna was paid straight time hourly rate of $18.00 <u>cash</u> per hour with no overtime premium paid after 40 hours. Thereafter she was paid $19.00 <u>cash</u> per hour with no overtime premium paid after 40 hours.

148.    Further, at all times relevant and for her entire tenure working for Chestnut Supermarket, she was not provided wage statements or wage notices.

149.    During the relevant period, Plaintiffs worked at all times alongside non-Mexican and/or non-actual or perceived immigrant Chestnut Supermarket employees whom received better treatment non-discriminatory treatment and pay than Plaintiffs on account of their national origin and/or perceived non-immigrant status.

150.    At all times relevant, Defendant Chesky Nieman, Defendant Joel Epstein and Defendant Moshe all directly managed and supervised Plaintiff Orduna.

<u>Plaintiff Quintana</u>

151.    In or around the Summer of 2021, Plaintiff Quintana was approximately 18 years old and had just arrived in New York City from Mexico.

152.    Plaintiff Quintana heard about a job from both his brother and cousin who had worked for Chestnut Supermarket and Landau's in South Fallsburg, New York for several years.

153.    Plaintiff Quintana was told to come by Chestnut Supermarket if he wanted a job.

154.    In turn, Plaintiff Quintana arrived at Chestnut the following morning and was greeted by Defendant General Manager Epstein, who introduced himself and directed him to get into a car with other workers and was driven to the South Fallsburg, New York location where he worked for the Summer months.

155.    In the Fall of 2021, he worked full-time at Chestnut supermarket as a stocker and did not return to the South Fallsburg location.

156.    At all times relevant, Quintana was instructed to "punch in" and "punch out" using a finger print punch in clock located at the entrance of the supermarket.

157.    During the relevant period, Plaintiffs worked at all times alongside non-Mexican and/or non-actual or perceived immigrant Chestnut Supermarket employees whom received better treatment non-discriminatory treatment and pay than Plaintiffs on account of their national origin and/or perceived non-immigrant status.

158.    At all times relevant, Defendant Moshe Landau, and Defendant Joel Epstein all directly managed and supervised Plaintiff Quintana.

### COMMON NYLL 194 DISPARATE PAY CLAIMS AS TO ALL PLAINTIFFS

159.    At all times relevant, in addition to the harassment and wage theft suffered by all Plaintiffs, they were also subjected to disparate pay because of their protected status by Defendants.

160.    Plaintiffs performed equal work, requiring equal skill, effort and responsibility performed under the same working conditions as those similarly situated without perceived protected status.

161.    Those similarly situated without perceived protected status are not more qualified, experienced or educated than Plaintiffs.

162.    Nonetheless Plaintiffs made only approximately $15-$20.00/per hour for performing the same job—equal work—than those similarly situated without perceived protected status whom, upon information and belief, made approximately $5-$10 more.

163.    The pay disparity cannot be explained by (a) a seniority system, (b) a merit system, (c) a system that measures earnings by quantity or quality of production, or (d) any bona fide factor other than Plaintiffs protected status.

164.    For all times relevant, Plaintiffs received disparate pay of approximately $5.00-$10.00 less per hour that they worked.

<u>**COMMON DISCRIMINATION ALLEGATIONS**</u>

165.    Although Plaintiffs Quintana and Crisantos were given an actual lunch break of thirty minutes, they were directed to a segregated and less desirable "break room" in the basement next to bathrooms.   However, the non-Mexican, non-immigrant workers were allowed to sit wherever and whenever they wanted in the actual store and at tables usually used by Customers to eat their lunch.

166.     Plaintiff Orduna and Solis were not provided ANY breaks and were forbidden from eating food they prepared at home. The first and last time Plaintiff Orduna brought food to eat, a Manager who refers to himself as "Rabbi" threw out her food and disciplined her.

167.    In or around the summer of 2021, Plaintiff Dominguez tried to eat lunch that he brought from home, only to be accosted by the Afternoon Manager who grabbed his food and threw it in the trash while he screamed at Dominguez, "to get the fuck outta here and go to the basement to eat!" This interaction left Dominguez feeling humiliated, scared and discriminated against.

168.     Plaintiff Orduna and Solis were continually and explicitly harassed by Defendant General Manager Epstein about the way they looked.  They were told that he hated the way they looked and that they "could not wear makeup because they were not Jewish."  In fact,  Defendant

General Manager Epstein and the other individual Defendants constantly made comments about the difference between Jewish people and Non-Jewish people.

169.    Plaintiff Orduna was also disciplined by Defendant General Manager Epstein for speaking Spanish,  and not abiding by his "English Only rule" applied only to Hispanics, stating: "I hate that shit. Don't speak Spanish. don't sing in Spanish don't speak to me in Spanish – I hate that shit."

### Defendant General Manager Epstein Regularly Openly Sexually Harassed the Female Plaintiffs

170.    Defendant General Manager Epstein would also come behind the counter where Plaintiff Orduna and Solis worked to find ways to be physically close to them and would regularly press his body against theirs from behind or run his hands over their bottoms when passing them. This was very unnerving and upsetting to both Plaintiffs.

### Defendant Chesky Refuses to Stop the Sexual Harassment When Plaintiffs Report it to Him

171.    In turn, Plaintiff Orduna reported the sexual harassment to Defendant Chesky to do something about it. Defendant Chesky responded that Defendant General Manager Epstein was the Manager of the Supermarket and he could do what he wanted. Plaintiff Orduna knew that it was futile to complain further and that being subjected to sexual harassment and gender discrimination would  continue to be a term and condition of her employment.

172.    Both Plaintiffs Orduna and Solis developed coping strategies for when Defendant General Manager Epstein would come behind the counter, including finding reasons to move to the wall or outside of the counter area.

173.    Despite their efforts to not be sexually harassed, Defendant General Manager Epstein was relentless in his pursuit of Plaintiff Orduna and even regularly asked Plaintiff Orduna to give him massages, which she refused to do.

**Defendant General Manager Epstein Sexually Harassed Male and Female Employees**

174.    Defendant General Manager Epstein engaged in sexual harassment of both male and female employees on a regular basis.

175.    Plaintiff Crisantos directly observed Defendant General Manager Epstein sexually harassing both female and male Hispanic colleagues. He witnessed Defendant General Manager Epstein closely following Defendants' employees, invading their personal space, making a show of looking up and down their bodies in a sexual manner, finding excuses to touch their backsides and bodies, and constantly making kissing sounds at them while staring at them.

176.    Plaintiff Crisantos was distressed by what he witnessed and was constantly on alert to stay out of Defendant General Manager Epstein's way so that he would not be sexually harassed by him.

177.    Plaintiff Dominguez was also subjected to sexual harassment by Defendant General Manager Epstein and Manager Mendy Abramowitz and observed both of them sexually harassing other employees regardless of their gender or sex on an everyday basis. Plaintiff Dominguez suffered extreme anxiety and disgust at Defendant General Manager Epstein's constant efforts to invade his personal space in a sexual manner.

178.    For example, when Plaintiff Dominguez had issues with his cash register, Defendant General Manager Epstein would block the entrance, and instead of letting Plaintiff Dominguez step aside, he would slide in between Plaintiff Dominguez and the register with his

buttocks pushing up against Plaintiff Dominguez crotch and stay there for far longer than he needed to.

179.    Defendant General Manager Epstein would also make kissing gestures at Defendant Dominguez and others. "Sometimes he would make these gestures towards [him] as he walked by. Sometimes if [Dominguez] looked up at the office [he] would see [Epstein] staring at [him]. As soon as [they] made eye contact [Epstein] would make kissing gestures … it made [Dominguez] feel so humiliated." Even worse, he "did not know who to complain to as [Epstein] was the store manager. Indeed, there was no one to complain to, and the unlawful behavior was open, notorious and completely condoned the behavior.

### Defendant Menachem Abramowitz also Sexually Harasses Male and Female Employees

180.    Plaintiff Dominguez realized that the other person he could have reported the behavior to Defendant Mendy Abramowitz, did the same to him. He not only made kissing sounds; he would also make lascivious gestures with his tongue at Plaintiff Dominguez and others.

181.    Also in or around early 2022, Manager Abramowitz put his hand on Plaintiff Dominguez's buttocks and Plaintiff Dominguez, shocked, yelled, "Hey yo! What are you doing"!! Defendant Abramowitz ignored the reaction and pretended like nothing had happened.

### Defendants Falsely Imprison and Abuse Plaintiff Quintana

182.    On the afternoon of Friday April 5, 2022, Plaintiffs were all busy at work at their various stations throughout the supermarket.

183.     Plaintiff Quintana was restocking chips when Defendant Mendy Abramowitz approached him and ordered him to go to the Management's Office located in the front of the store by the cash registers.

184.    Defendant Mendy Abramowitz accompanied Plaintiff Quintana as they both walked through the store to Management's office, where Defendant Mendy Abramowitz punched in a passcode code on an electronic lock that unlocked the door and directed Plaintiff Quintana to enter.  The door shut and locked behind them.

185.    When he entered the room Plaintiff Quintana saw Defendant General Manager Epstein sitting in the office in a rage.

186.    Instead, Defendant General Manager Epstein screamed at Plaintiff Quintana to strip down to his undershirt, to turn his pockets inside out and to show him his hands.

187.    Plaintiff Quintana, just 18 years old, was shocked, confused bewildered and scared. He was locked in a room with a man known to be extremely abusive, especially to Non-Jewish and people of color, who regularly sexually harassed employees, and now that man was demanding that he undress with no explanation at all as to why he wanted him to undress.  He was extremely frightened and had no idea what was happening to him. He felt very threatened and scared,  which caused him to feel extreme humiliation.

188.     Defendant General Manager Epstein buzzed the locks open and Manager Sam entered the offices, causing even more fear for Plaintiff Quintana.

189.    Defendant General Manager Epstein and Manager Sam screamed "WHERE IS THE MONEY YOU STOLE?" Plaintiff Quintana had no idea what they were talking about and was terrified that he was going to be physically attacked as the men threatened him.

190.    Defendant General Manager Epstein demanded Plaintiff Quintana to hand over his wallet to be searched and told Manager Sam to go to the basement and search Plaintiff Quintana's other belongings.

191.    Plaintiff Quintana was locked in the office and terrified about not being free to leave.

**Defendants Falsely Imprison and Abuse Plaintiff Crisantos**

192.    Meanwhile, Crisantos was also busy working at Defendants' grocery store when he was approached and ordered to go to the Management Office.

193.    When Crisantos arrived, the office was locked and so he knocked on the door. He heard a buzzing sound and the door opened.

194.    Plaintiff Crisantos was shocked to find  his cousin, whom he had recommended to come work at the store in obvious distress.

195.    As he took in the situation, Defendant General Manager Epstein began wildly screaming again and again, "WHERE IS THE MONEY?"

196.     Plaintiff Crisantos was incredulous and asked, "Is this for real? Are you serious? Is this a joke?"

197.    Just as he had done with Plaintiff Quintana, Defendant General Manager Epstein demanded that Plaintiff Crisantos remove his clothing.

198.    Plaintiff Crisantos protested and told him, "This is not okay – you can't do this to us. This is not okay."

199.    Over Plaintiff Crisantos' protests, Defendant General Manager Epstein ordered him to remove his clothing and asked where he kept his other belongings so that they could be searched as well. Not knowing what else to do, he pulled up his sweatshirt to show that nothing was being hidden underneath. Just as was done with Quintana Manager Sam was directed to go locate Crisantos's jacket and other belongings to search for the "missing money."

200.    Horrified especially at the way his 18 year old cousin was being abused, Plaintiff Crisantos insisted that they be told what exactly they were being accused of.

201.    Defendant General Manager Epstein began screaming that he knew they conspired to steal $1,400.00 that he gave to a "Lady as charity."

202.    Plaintiff Crisantos, who had not stolen any money or conspired to steal any money, kept telling Defendant General Manager Epstein that he had not stolen or conspired to steal anything. Defendant General Manager Epstein continued screaming and said that the "Lady Shopper" left the "charity" money in the bathroom by mistake and that he has video of the employees who used the bathroom in or around the time that the "Lady Shopper" left the money behind.

203.    Plaintiff Crisantos was in utter shock and disbelief that after dedicating himself to this store for almost a decade that he and his teenage cousin were being falsely accused of a felony, locked in a room and denied their freedom, and treated like criminals.

**Defendants Falsely Imprison and Abuse Plaintiff Orduna**

204.    Plaintiff Orduna was at the Chesky's deli counter attending to orders when she was approached by Defendant Moshe Landau's "son in law", Joel Landau (sic/lnu), who ordered her to go to the Management office. Plaintiff Orduna was scared as she had never been so summoned in the middle of a shift.

205.    As she got closer to the office, she began to feel increasingly self-conscious as colleagues and customers stared at her.

206.    When Plaintiff Orduna arrived at the Management office the door was locked. She waited a minute and heard a buzzing sound and the door's lock was released and she entered the room.

207.    As soon as she entered the office Defendant General Manager Epstein began screaming at Plaintiff Orduna, "WHERE IS THE MONEY? SHOW ME THE MONEY. LET ME GET THE MONEY."

208.    The door closed and locked behind her. Plaintiff Orduna was terrified to find herself locked in the Manager's Office.  She noticed that both Plaintiff Quintana and Plaintiff Crisantos were visibly upset and that Plaintiff Quintana looked in shock. She heard Plaintiff Crisantos was whispering in Spanish trying to console and calm his young cousin.

209.    Shocked and terrified, Plaintiff Orduna responded, "I don't know what you are talking about. I don't have any money."

### Defendants Demand that Plaintiff Orduna Undress

210.    Defendant General Manager Epstein screamed "Where did you hide the money? When Plaintiff Orduna told him she didn't know what he was talking about, he screamed "Take off your clothes!" Plaintiff Orduna's blood ran cold, Defendant General Manager Epstein openly and aggressively sexually harassed her on a regular basis, and now, while holding her hostage in a closed very small office with her male colleagues, he was demanding that she take off her clothes in front of him and several other men.

211.    Plaintiff Orduna was shocked that Defendant General Manager Epstein had locked her in a room and was trying to make her take off her clothes in front of several men. She tearfully told him that she would not take her clothes off.

212.    Plaintiff Orduna, who did not even know what she was being accused of, felt panicked and feared that she would be beaten or raped.

213.    Defendant General Manager Epstein, obviously seething, warned her that if the Wrongfully Accused Plaintiffs did not do what he said that he was going to call the police and that ICE was going to deport them, "just like [they] deported Quintana's brother."

214.    Apparently, Defendant General Manager Epstein was aware that Plaintiff Crisantos's brother had been arrested by ICE and deported years before. When Defendant General Manager Epstein threatened that he could make this happen, the Wrongly Accused Plaintiffs believed his threat and prepared themselves to be falsely arrested and deported on the spot.

215.    Plaintiff Orduna, scared to death that she and the other Plaintiffs could be arrested and deported, asked that a female officer be called in order for her to take off her clothes.

216.    In response, Defendant General Manager Epstein screamed, "Take off your clothes, fucking bitch" and picked up his phone to make a call while continuing to scream over the Wrongly Accused Plaintiffs protests, "You fucking bitch, you have to take off your clothes, I want to see what is under there."

**Defendant General Manager Epstein Becomes Enraged when Plaintiff Orduna Records Him and Calls the Shromrim**

217.    Scared of what could happen to her and the other Plaintiffs if she did nothing, Plaintiff grabbed her cell phone, pointed it at Defendant General Manager Epstein and announced that she was recording him.

218.    When Defendant General Manager Epstein saw that Plaintiff Orduna was recording him, he immediately stopped screaming. Defendant General Manager Epstein looked shocked and flabbergasted, as if it had never occurred to him that he could be recorded-or that a Hispanic, Non-Jewish female would dare to stand up to him.

219.    He immediately made a phone call to, upon information and belief, the Shromrim, because he was scared that Plaintiff Orduna had videotaped him and he wanted them to stop her

from using the video.  He then immediately physically attacked her by grabbing her wrist which was by her face, shaking her, and then pushing her into the wall in an effort to stop the recording and get her phone.

220.    When he had her pressed against the wall, he forcibly pried her phone from her hands against her will and passed the phone through an open window to Manager Sam who left with her phone.

221.    Plaintiffs Quintana and Crisantos watched in horror as Plaintiff Orduna was assaulted, battered, and stolen from. They felt helpless to protect her, because they were all prisoners and they feared that any action they took would make matters even worse for all of them.

222.    Plaintiff Orduna, crying hysterically, screamed "You cannot do this to us! I am calling the police. You are scaring us!"

223.    Defendant General Manager Epstein screamed over her, "All of you are nothing, you are nothing – you understand that? You are nothing. I am Jewish and I can do whatever I want. I have power. You are NOTHING. You are rats!" A mantra that Plaintiffs had heard many times before throughout their tenure.

224.    Finally, Defendant General Manager Epstein buzzed open the door and screamed "Get the fuck out of here" to Plaintiff Orduna and warned that he did not want to see her face.

225.    Plaintiff Orduna, Plaintiffs Quintana and E.R. Quinta ran out of the office as quickly as they could.

226.    Upon information and belief and unknown to Plaintiffs, Defendant General Manager Epstein immediately called the Shromrim to try to stop Plaintiff Orduna from calling the actual police.

**Plaintiff Orduna Calls the New York Police Department**

227.    Manager Sam Guachiak was waiting outside of the office and Plaintiff Orduna, with Plaintiffs Quintana and Crisantos by her side, demanded her phone back. After first refusing, he turned the phone over to her.

228.    Plaintiff Quintana's brother was downstairs waiting for them to come out of the locked office and was crying and it was obvious that all of the employees in the store were aware of what had happened and were terrified.

229.    Plaintiff Orduna immediately called 911 and reported that she was assaulted and falsely imprisoned by Defendants and that she needed the police to come to the Grocery Store immediately.

230.    As the Wrongly Accused Plaintiffs made their way into the shopping area of the store they realized that Defendants had told everyone that they were thieves Plaintiff Orduna felt as if she were going to faint.

231.    Colleagues, customers and community members started gathering around the Wrongly Accused Plaintiffs as they waited for the police to arrive in response to Plaintiff Orduna's report. The Wrongly Accused Plaintiffs were humiliated – not only were they being falsely accused of crimes they did not commit – it appeared that management was looking at them as if they were already convicted criminals.

**The Shomrim Pressures Plaintiff Ortuna to "Negotiate" With Them Instead of Reporting Defendants' Crimes to the Police**

232.    Suddenly, three men dressed in black pants, two wearing white shirts and the other in black approached Plaintiffs and falsely identified themselves as "the Police." They ordered Plaintiff Orduna to go with them to the back of the supermarket. Upon information and belief,

these men who identified themselves as "the police" were volunteer members of the neighborhood watch, known as the "Shomrim."

233.    Upon information and belief, at all times the Shomrim were acting at the direction of, on behalf of and as agents of the Defendants.

234.    Plaintiff Orduna, who had just been falsely imprisoned, threatened, attacked, screamed at, assaulted and battered, was terrified and insisted that she did not feel safe going anywhere with anyone until uniformed NYPD officers arrived.

235.    Plaintiffs Quintana and Crisantos braced themselves for an arrest – they believed that these men were called by Defendant General Manager Epstein and that they were going to be arrested and deported.

236.    At that moment, Defendant Moshe Landau's son-in-law appeared again and approached Plaintiff Orduna and put his face so close to Plaintiff Orduna's face that she could feel his breath and yelled, "Stop crying! You better go with them!"

237.    Plaintiff Moreno, despite knowing that he would be retaliated against for standing up for Plaintiff Orduna and though he feared the Shomrim's reaction, feared losing his own job and feared for his own safety, bravely intervened, and demanded that they leave Plaintiff Orduna alone, "You are making her cry! Stop it. Leave her alone!"

238.    The Shomrim glared at Plaintiff Moreno intimidatingly, but he stayed by Plaintiff Orduna's side. He was ignored.

239.    The "Shomrim" repeatedly demanded that Plaintiff Orduna talk to them in private, and though she stalled them as long as she could in the hopes that the actual police would arrive, eventually she had no choice but to walk with them slightly away from the crowd that had gathered.

240.    To her surprise, one to the "Shomrim" growled, "Shut up and listen to us and don't speak. How much money would it take for you to shut your mouth?"

241.    Plaintiff Orduna was shocked to realize that the Shomrim were trying to bribe her so that she would not report the Defendants to the police.

242.    She replied, "I don't want to negotiate, I want help. We didn't do the things they accused us of. I don't know what you want."

243.    The Shomrim responded threateningly, "If you don't negotiate, you could be in a lot of trouble."

244.    When Plaintiff repeatedly stated that she did not want "to negotiate," the Shomrim members warned her, "You better think about this, you can be in a lot of trouble with us if you don't negotiate. We have a lot of power. These people[your bosses],they have a lot of power."

245.    Plaintiff, alarmed by the threats, yelled "No" and returned to where the other Plaintiffs were.

**Plaintiff Orduna is Fired When She Refuses to "Negotiate" With the Shomrim Instead of Reporting Defendants Criminal Activity to the Police**

246.    Defendant General Manager Epstein appeared and screamed for Plaintiffs Quintana and Crisantos to "get back to work," as if two human beings who had just been falsely accused of crimes they did not commit, imprisoned and threatened with deportation would just go back to work. Indeed, Plaintiffs Quintana and Crisantos were constructively discharged on April 5, 2022.

247.    He then turned to Plaintiff Orduna and screamed, "Get the fuck out of here – you are fired. You fucking bitch – I don't want to see your fucking face in my supermarket."

248.    Terrified and humiliated, Plaintiff Orduna and the other Wrongly Accused Plaintiffs walked outside and waited for the NYPD to arrive.

249.     As soon as the NYPD arrived, the Wrongfully Accused Plaintiffs reported the False Imprisonment, defamation and tortious conduct they had endured. The NYPD officers escorted the Wrongfully Accused Plaintiffs through the store to retrieve their remaining personal belongings. Defendant General Manager Epstein made a show of laughing at them as they were leaving.

250.     The police report filed on April 5, 2022 alleges the crime of Harassment in the fourth degree.

## Plaintiff Moreno is Constructively Discharged

251.     Plaintiff Moreno knew that objecting to the unlawful way his co-workers were treated made him a target for the Defendants, and he knew that  he was not safe at the Supermarket anymore.  He felt especially unsafe after seeing the outrageous way Defendants treated his co-coworkers, and he knew that there was no way to deny that Defendants thought that Hispanic Immigrant and Non-Jewish workers- were nothing but "rats."

252.     Plaintiff Moreno knew that all Hispanic Immigrant employees were subject to abuse, false imprisonment, battery, and having the Shamrim called on them.

253.     Although Plaintiff Moreno had been subjected to discrimination and wage theft up until that point, the way that the Wrongfully Accused Plaintiffs were treated was not something that a reasonable person could accept as part of their job.

## Defendants Find the Misplaced Money

254.     Thereafter, employees at the store learned that the Defendants had located the misplaced money or that there was never money missing at all. Upon information and belief, at no time did Defendants make any effort to investigate, apologize to anyone, take any accountability

for their wrongdoing or false accusations or take any accusation to clear the names of the Wrongly Accused Plaintiffs.

255.    In or about early April 2022, Defendant General Manager Epstein called Plaintiff Dominguez to the same office where the Wrongly Accused Plaintiffs were abused, to meet with him and Defendant Mendy Abramowitz.

256.    Plaintiff Dominguez was immediately on edge and fearful that he would also be falsely imprisoned.

257.    Once seated, Defendant General Manager Epstein reported in disgust that the Wrongfully Accused Plaintiffs were bringing a lawsuit and the Defendants "wanted to know which workers were going to "support the Store."

258.    Defendant General Manager Epstein demanded that Plaintiff Dominguez tell him his viewpoint. It was clear to Plaintiff Dominguez that Defendant General Manager Epstein was threatening his job, but he felt compelled to tell the truth.

259.    Plaintiff Dominguez responded, "I am scared and I don't want to be in any kind of trouble, but I am on the side of the truth and that what I saw was wrong. When you touch a female or a girl in the way that [Epstein] did, you can be in big trouble."

260.    Enraged, Defendant General Manager Epstein grabbed Plaintiff Dominguez very hard by his wrists and started to shake his arms while screaming do you think that a lawsuit for what I am doing to you is justified?  Defendant General Manager Epstein shook Plaintiff Dominguez like a ragdoll.

261.    Plaintiff Dominguez was shocked and confused but realized that Defendant General Manager Epstein was assaulting him the way that he had assaulted Plaintiff Ortuna in an effort to prove that she should not sue him for such behavior.

262.   Plaintiff Dominguez was shocked, offended and scared that Defendant General Manager Epstein was also assaulting him.  To Defendant General Manager Epstein's great ire, Plaintiff Dominguez refused to be bullied into submission and again reiterated, "When you touch someone like that in an aggressive way you can get in trouble."

263.   Plaintiff Dominguez in a state of shock, stated, "you asked me what I thought, that is what I have to say if I am called to testify" and in return, Defendant General Manager Epstein angrily growled,  "Go."  Approximately one week later, Plaintiff Dominguez was terminated.

264.   Plaintiffs were targeted, demeaned, threatened, defamed, assaulted, battered, discriminated and retaliated against all because of their protected status.

265.   Plaintiffs aver that no white and/or Jewish employee would have been treated in the manner as Plaintiffs or wrongfully accused of criminal activity without an investigation of any kind.

266.   Defendants treated Plaintiffs in a manner that is shameful, egregious, illegal, and in blatant violation of their civil rights.

267.   Upon information and belief, Plaintiffs were not randomly targeted by Defendants.

268.   Rather Plaintiffs were targeted and wrongly accused of crimes because of their protected status as Non-Jewish, Hispanic, Immigrants.

269.   Upon information and belief and based on the facts contained herein, Defendants Chestnut and Moshe Landau authorized and ratified the treatment Plaintiffs were subjected to.

270.   In addition to the general hostile work environment that all of the Plaintiffs were regularly subjected to,  upon information and belief, Defendants decision to detain, defame, assault and batter certain Plaintiffs was intentional discrimination on the basis of their protected status.

271.    Upon information and belief, Defendants all acted in concert to discriminate against Plaintiffs.

272.    Upon information and belief, Chestnut and Defendant Moshe Landau encouraged, condoned and/or approved the racial profiling, unlawful detention, and other tortious conduct and civil rights violations of Plaintiffs by its employees, by inter alia failing to properly retrain the above-mentioned Defendant employees and /or by failing to discipline the employees involved.

273.    Rather, upon information and belief, Defendant Moshe Landau preferred to intimidate and/or bribe Plaintiffs than discipline and/or terminate the employees who were blatantly discriminating against and abusing employees.

274.    All Plaintiffs have suffered severe and/or egregious emotional distress as a result of Defendants' deliberate, outrageous discriminatory actions and continue to be traumatized and frightened by the experience.

275.    All Plaintiffs have yet to find comparable jobs to replace the ones that were stolen from them.

### FIRST CAUSE OF ACTION
### (PERCEIVED IMMIGRATION STATUS DISCRIMINATION)
### UNDER THE NYCHRL—HOSTILE WORK ENVIRONMENT AGAINST ALL
### DEFENDANTS BY ALL PLAINTIFFS

276.    Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

277.    Defendants have discriminated against Plaintiffs on the basis of their perceived immigration status in violation of the NYCHRL by subjecting Plaintiffs to a hostile work environment in the form of subjection them to a hostile treatment including but not limited to subjecting them to degrading epithets, false imprisonment, assault, battery, physical and verbal harassment, slander per se, discriminatory statements about their native language stolen wages,

constructive and actual discharge and indifference to their injuries in part because of their perceived immigration status.

278.    All Defendants by their actions, including individual Defendants, have directly created, ratified, enforced or implemented the policies of disparate treatment.

279.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages and other relief.

280.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this they are entitled to an award of monetary damages and other relief.

281.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs rights under the NYCHRL for which Plaintiffs are entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (NATIONAL ORIGIN DISCRIMINATION UNDER THE NYCHRL—HOSTILE WORK ENVIRONMENT) AGAINST ALL DEFENDANTS BY ALL PLAINTIFFS

282.    Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

283.    Defendants have discriminated against Plaintiffs on the basis of their Mexican and Ecuadorian national origin status in violation of the NYCHRL by subjecting Plaintiffs to a hostile work environment in the form of subjection them to a hostile treatment including but not limited to subjecting them to treatment including but not limited to subjecting them to degrading epithets,

false imprisonment, assault, battery, physical and verbal harassment, slander per se, discriminatory statements about their native language, stolen wages, constructive and actual discharge and indifference to their injuries in part because of their national origins.

284.    All Defendants by their actions, including individual Defendants, have directly created, ratified, enforced or implemented the policies of disparate treatment.

285.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages and other relief.

286.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this they are entitled to an award of monetary damages and other relief.

287.     Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs' rights under the NYCHRL for which Plaintiffs are entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (DEFAMATION PER SE)
### AGAINST DEFENDANTS JOEL EPSTEIN
### AS TO PLAINTIFFS ORDUNA, QUINTANA and CRISANTOS

288.    Plaintiffs incorporate by reference the factual allegations in this complaint, as if fully set forth.

289.    Defendants broadcast statements publicly throughout the store accusing Plaintiffs Orduna, Quintana and Crisantos of felony crimes and did so with malice to smear Plaintiffs' reputation and to harass them.

290.    Defendants published the statement with reckless disregard for their truth or falsity of the statement.

291.    Defendants' defamatory statements are of and concerning Plaintiffs, private people, and not concerning matters arguably of public concern.

292.    Moreover, by implying Plaintiffs are criminals, Defendants' statement constitutes slander *per se* as to Plaintiffs Orduna, Quintana and Crisantos.

293.    Based on the foregoing, Defendants jointly and, with malice and/or with reckless disregard to its truth or falsity, caused a false statement of fact to be published on April 5, 2022, to approximately one hundred persons.

294.    Defendants' statement inputs to Plaintiffs the criminal activity of Felony Larceny, and is harmful to their reputations per se.

295.    Defendants made the false and defamatory statement intentionally for the purpose of injuring Plaintiffs reputation based on Defendants' discriminatory beliefs about Plaintiffs.

296.    As a direct result of Defendants' conduct, Plaintiffs experienced severe mental and emotional distress and plaintiff was subjected to extreme humiliation, embarrassment, mental anguish, and other highly unpleasant mental and emotional reactions lasting over a prolonged period of time.

297.    Defendants' acts were done knowingly, willfully, and with malicious intent, and Plaintiffs are entitled to punitive damages in an amount to be determined by proof at trial.

## FOURTH CAUSE OF ACTION
### (BATTERY)
**AGAINST DEFENDANTS CHESTNUT and JOEL EPSTEIN AS TO  PLAINTIFFS DOMINGUEZ and ORDUNA**

298.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

299.    Based on the foregoing, Defendant Joel Epstein intended to cause and did cause a harmful contact with Plaintiff Dominguez and Orduna's person as described herein.

300.    Plaintiff did not consent to Defendant Joel Epstein acts.

301.    As a direct and proximate result of Defendant Joel Epstein's conduct, Plaintiff suffered extreme mental anguish and physical pain.

302.    Defendant Joel Epstein's act was done knowingly, willfully, and with malicious intent, and Plaintiff is entitled to punitive damages in an amount to be determined by proof at trial.

303.    Defendant Chestnut is vicariously liable for such acts of its agent which it condoned by failing to properly supervise Defendant Joel Epstein.

### FIFTH CAUSE OF ACTION
**(ASSAULT)**
**AGAINST DEFENDANTS CHESTNUT and JOEL EPSTEIN  AS TO**
**PLAINTIFFS CRISANTOS,  DOMINGUEZ, ORDUNA and QUINTANA**

304.    Plaintiffs hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

305.    Defendant Joel Epstein intended to cause and did cause Plaintiffs to suffer apprehension of an immediate harmful contact as described herein.

306.    Plaintiffs have suffered emotional distress damages as a result of defendant's action.

307.    Defendants' act was done knowingly, willfully, and with malicious intent, and Plaintiffs are entitled to punitive damages in an amount to be determined by proof at trial.

308.    Defendant Chestnut is vicariously liable for such acts of its agent which it condoned by failing to properly supervise Defendant General Manager Epstein.

## SIXTH CAUSE OF ACTION
### (GENDER MOTIVATED VIOLENCE PURSUANT TO GMVA)
### AGAINST DEFENDANTS CHESTNUT and JOEL EPSTEIN AS TO PLAINTIFF ORDUNA

309.    Plaintiff Orduna hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as it set forth fully herein.

310.    The above-described conduct of Defendant Chestnut and Defendant Joel Epstein, including, but not limited to, Defendant General Manager Epstein's assault and battery of Plaintiff Orduna constitutes a "crime of violence" and a "crime of violence motivated by gender" against Plaintiff Orduna as defined by the New York City Gender Motivated Violence Act, N.Y.C. Admin. Code § 8-903 (2017).

311.    The above-described conduct of Defendant General Manager Epstein, including but not limited to the assault and battery of Plaintiff Orduna, constitutes a "crime of violence" against Plaintiff Orduna motivated: (i) by her gender; (ii) on the basis of her gender; and/or (iii) due, at least in part, to an animus based on her gender.

312.    Defendant General Manager Epstein committed a "crime of violence" against Plaintiff Orduna because she is a woman and, at least in part, because he has an unlawful animus towards women.

313.    Defendant General Manager Epstein's gender-motivated animus towards women in demonstrated by, among other things, his actual sexual harassment of female employees, the disregard for the rights of women to not be sexually or otherwise harassed, regardless of their national origin and perceived or actual status, and specifically his violent and abusive treatment of women at the workplace as evidenced by the assault and battery of Plaintiff Orduna.

314.    As a direct and proximate result of the aforementioned gender-motivated violence, Plaintiff Orduna has sustained in the past and will continue to sustain, monetary damages, physical

injury, pain and suffering, and serious psychological and emotional distress, entitling he to an award of compensatory damages.

315.    Defendant General Manager Epstein's gender motivated violence against Plaintiff Orduna entitles her to punitive damages and an award of attorney's fees and costs.

### SEVENTH CAUSE OF ACTION
### (SEXUAL HARASSMENT AND GENDER DISCRIMINATION -- HOSTILE WORK ENVIRONMENT—UNDER NYCHRL)
### AGAINST  DEFENDANTS CHESTNUT,
### JOEL EPSTEIN and MENACHEM ABRAMOWITZ AS TO  ALL PLAINTIFFS)

316.    Plaintiffs hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

317.    Defendants Chestnut, Joel Epstein and Menachem Abramowitz have discriminated against Plaintiff Orduna and Solis on the basis of her gender in violation of the New York City Human Rights Law by subjecting Plaintiffs to sexual harassment and a hostile work environment.

318.    Defendants Chestnut, Joel Epstein and Menachem Abramowitz subjected all Plaintiffs to sexual harassment and a hostile work environment by Defendant Manager Joel Epstein and Menachem Abramowitz.

319.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs has suffered, and continues to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages and other relief.

320.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, and for this they are entitled to an award of monetary damages and other relief.

**EIGTH CAUSE OF ACTION**
**(AIDING AND ABETTING SEXUAL HARASSMENT AND GENDER**
**DISCRIMINATION – HOSTILE WORK ENVIRONMENT – UNDER THE NYCHRL)**
**AGAINST DEFENDANTS CHESTNUT, MOESHE LANDAU AND CHESKY NEIMAN**
**AS TO ALL PLAINTIFFS**

321.    Plaintiffs hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

322.    Defendant Moshe Landau,  Chesky Neiman and Chestnut have aided and abetted sexual harassment and/or gender discrimination by Defendant Chestnut, Joel Epstein and Menache Abramowitz against Plaintiffs on the basis of their gender and/or their protected statuses in violation of the New York City Human Rights Law by failing to undertake a good faith investigation into allegations of wrongdoing by Joel Epstein and Menache Abramowitz, by retaining him in a managerial position after upon information and belief complaints were made throughout his tenure at Chestnut and thus allowing him to remain in a position to harass Plaintiffs after they made her complaints to Defendant Chesky and others.

323.    As a direct and proximate result of Defendant Chestnut's, Moshe Landau's, and Chesky Neiman's unlawful aiding and abetting conduct in violation of the NYCHRL, Plaintiffs have suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

324.    As a direct and proximate result of Defendant Chestnut, Moshe Landau and Chesky Neiman's unlawful aiding and abetting conduct in violation of the NYCHRL, Plaintiffs have suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, and for this she is entitled to an award of monetary damages and other relief.

**NINTH CAUSE OF ACTION**
**(NEGLIGENT HIRING, TRAINING, SUPERVISION)**
**Against**
**DEFENDANT CHESTNUT**

325.    Plaintiffs hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

326.    In hiring and supervising managers, Defendant Chestnut had a duty to prevent individually named Defendants from engaging in harassing, discriminatory, tortious and/or otherwise unlawful conduct.

327.    Defendant Chestnut negligently and/or recklessly failed to satisfy their duty of care in hiring, supervising and retaining individually named Defendants who engaged in and continues to engage in a practice of discrimination and other tortious conduct.

328.    Defendant Chestnut knew or should have known that individually named Defendants subjected Plaintiffs, in their charge, to sexual harassment, assault, battery, physical intimidation, false imprisonment, IIED, slander per se and discrimination based on their protected activities.

329.    Defendant Chestnut also knew or should have known that their failure to abide by a non-discrimination policy and practice as to hiring and retention have created an unreasonable risk of discrimination and other unlawful conduct that would harm Plaintiffs.

330.    As a result of Defendant Chestnut's conduct, Plaintiffs has suffered and continues to suffer injuries and damages.

**NINTH CAUSE OF ACTION**
**(FALSE IMPRISONMENT)**
**AGAINST DEFENDANTS JOEL EPSTEIN AND CHESTNUT**
**AS TO PLAINTIFFS ORDUNA, QUINTANA and CRISANTOS**

331.    Plaintiffs hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

332.    Defendants had no reasonable cause to believe that Plaintiffs had engaged in felony larceny or any other kind of misconduct at Chestnut prior to their false imprisonment.

333.    There is no legal justification for Defendant's non-consensual detention of Plaintiffs in a passcode protected locked confined space, Defendant's refusal to allow them to leave the detention area and/or Defendant's physically preventing them from leaving the detention area.

334.    Defendant physically restrained Plaintiffs for a long period of time without their consent and against their will.

335.    As a result of Defendant's conduct, Plaintiffs have suffered and continue to suffer injuries and damage.

**TENTH CAUSE OF ACTION**
**(INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)**
**AGAINST ALL DEFENDANTS**
**AS TO**
**ALL PLAINTIFFS**

336.    Plaintiffs hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

337.    Plaintiffs have suffered severe emotional distress due to being forcibly detained in Managements' locked offices, falsely accused of conspiring to and actually committing felony larceny, interrogated, berated, subjected to derogatory epithets, assaulted, directed to remove their clothing and battered upon non-compliance, their bodies and personal belongings illegally

searched; all in an outrageous attempt to coerce Plaintiffs into a <u>false confession</u> and threatened with ICE arrest and deportation.

338.    All Plaintiffs suffer continuous and sustained emotional distress as a result of Defendants' actions.

339.    These actions by Defendants were intentional, and Plaintiffs emotional distress was reasonably foreseeable to Defendants.

340.    As a result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer injuries and damages.

**ELEVENTH CAUSE OF ACTION**
**(VIOLATIONS OF THE NYCHRL N.Y., ADMIN. CODE § 8-107[1])**
**AS TO**
**ALL PLAINTIFFS**

341.    Plaintiffs hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

342.    By reason of the foregoing, Defendant has violated NYCHRL § 8-107[1][a], which states it shall be an unlawful discriminatory practice for "an employer or an employee or agent thereof, ... to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment" on the basis of, inter alia, their sex, gender, race, color and/or national origin.

343.    The conduct of Defendants, in subjecting innocent Plaintiffs to detention and interrogation without reasonable cause because of their sex, gender race, color, and/ or national origin, constitutes an illegal adverse action against Plaintiffs in violation of the New York City, N.Y., Admin. Code § 8-107[I][a].

344.    The conduct of Defendants, in subjecting innocent Plaintiffs to detention and interrogation without reasonable cause because of her race, color, and/ or national origin, constitutes a hostile work environment, which resulted in Plaintiffs' constructive discharge.

345.    As the actions against Plaintiffs were taken by employees of Defendant in management and supervisory positions, Defendant employer is subject to liability under the NYCHRL.

346.    Defendant's employees acted according to a company policy or practice Defendant encouraged, condoned and/or approved of the acts of their employees by failing to discipline them.

347.    Defendants have thereby violated the NYCHRL.

348.    As a result of Defendant's unlawful conduct, Plaintiff suffered and continues to suffer injuries and damages, including but not limited to lost wages and emotional distress damages.

**TWELTH CAUSE OF ACTION**
**(NEW YORK STATE MINIMUM WAGE ACT -MINIMUM WAGE and OVERTIME CLAIM, NYLL §650 ET SEQ.),**
**AGAINST**
**DEFENDANTS CHESTNUT, NEIMAN CHESKY AND MOSHE LANDAU**
**AS TO**
**PLAINTIFFS DOMINGUEZ, MORENO, ORDUNA, and SOLIS**

349.    Plaintiffs Dominguez, Moreno, Orduna and Solis repeat, reallege and incorporate each and every preceding paragraph as if set forth fully herein.

350.    Throughout the period covered by the applicable statute of limitations, Defendants willfully and repeatedly failed to pay Plaintiffs minimum wage and/or at the overtime rate for hours worked in excess of forty (40) hours per workweek as required by NYLL, paying Plaintiffs straight time for all hours worked.

351.    Defendants' failure to pay Plaintiffs minimum wage and/or at the overtime rate was willful within the meaning of the NYLL.

### THIRTEENTH CAUSE OF ACTION
**(FEDERAL LABOR STANDARD ACT - OVERTIME CLAIM)**
**AGAINST**
**DEFENDANT CHESTNUT AND DEFENDANT NEIMAN CHESKY**
**AND  DEFENDANT MOSHE LANDAU**
**AS TO**
**PLAINTIFFS DOMINGUEZ, MORENO, ORDUNA, and SOLIS )**

352.    Plaintiffs Dominguez, Moreno, Orduna and Solis , repeat, reallege and incorporate each and every preceding paragraph as if set forth fully herein.

353.    Throughout the period covered by the applicable statute of limitations, Defendants Chesky and/or Defendant Chestnut willfully and repeatedly failed to pay Plaintiffs Dominguez, Moreno, Orduna and Solis minimum wage and/or the overtime rate for hours worked in excess of forty (40) hours per workweek as required by FLSA, paying Plaintiffs straight time for all hours worked.

354.    Defendants' failure to pay Plaintiffs minimum wage and/or overtime was part of a plan to deprive them of their lawful pay in violation of FLSA § 207.

355.    Defendants' failure to pay Plaintiffs minimum wage and/or overtime was willful within the meaning of the FLSA.

### FOURTEENTH CAUSE OF ACTION
**(NOTICE-AND-RECORDKEEPING REQUIREMENTS, NYLL § 195(1)), AGAINST**
**DEFENDANT CHESTNUT, NEIMAN CHESKY and MOSHE LANDAU**
**AS TO**
**PLAINTIFFS DOMINGUEZ, MORENO, ORDUNA, and SOLIS**

356.    Plaintiffs Dominguez, Moreno, Orduna and Solis repeat, reiterate, and incorporate each and every preceding paragraph as if set forth fully herein.

357.    Defendants have failed to provide Plaintiffs with wage notices as required on February 1 of every year in violation of NYLL § 195(1).

358.    Defendants' failure to pay issue such notices was willful within the meaning of the NYLL.

### FIFTEENTH CAUSE OF ACTION
### (NOTICE-AND-RECORDKEEPING REQUIREMENTS, NYLL § 195(3)),
### AGAINST DEFENDANT CHESTNUT AND DEFENDANT NEIMAN CHESKY
### AS TO
### PLAINTIFFS DOMINGUEZ, MORENO, ORDUNA, and SOLIS

359.    Plaintiffs Dominguez, Moreno, Orduna and Solis , reiterate, and incorporate each and every preceding paragraph as if set forth fully herein.

360.    Defendants have failed to provide Plaintiffs with wage statements or explanations of how their wages were calculated in violation of NYLL § 195(3).

361.    Defendants' failure to pay issue such statements was willful within the meaning of the NYLL.

### SIXTEENTH CAUSE OF ACTION
### (PAY DISPARITY PURSUANT TO NYLL 194(1))
### AGAINST DEFENDANTSCHESTNUT AND DEFENDANT NEIMAN CHESKY
### AS TO
### ALL PLAINTIFFS

362.    Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

363.    Based on those allegations, Defendants, as their employers exercising operational control, subjected Plaintiffs to disparate pay on the basis of their race and/or National Origin by paying Plaintiffs a rate of pay of approximately $5.00-$10.000 per hour less than that paid to employees of other National Origins and other Races performing equal work, which required equal

skill, effort, and responsibility, and under the same working conditions and at the same establishments or establishment within the same county.

364.    The pay discrepancy because of race and/or National Origin cannot be accounted for by a seniority system; (b) a merit system; or (c) any bonafide factor other than their National Origin and/or Race.

365.    Plaintiffs seek to recover unpaid compensation, and treble damages pursuant to the NYLL, attorneys' fees, costs, pre- and post-judgment interest along with such other relief as this Court deems just and proper.

## SEVENTEETH CAUSE OF ACTION
## (RETALIATION IN VIOLATION OF THE NYCHRL § 8-107(7)) AGAINST ALL DEFENDANTS AS TO ALL PLAINTIFFS

366.    Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

367.    During the period covered by the applicable statute of limitations, Defendants retaliated against Plaintiffs by threatening them with termination and in fact terminating their employment for being subject to, witnessing and or potentially testifying to discriminatory/illegal conduct and making complaints regarding their discrimination to their private attorney, undersigned counsel.

368.    As a result of this retaliation, these Plaintiffs were terminated and seek their damages, in the form of backpay and front pay.

## JURY TRIAL

369.    Plaintiffs demand a jury trial for all causes of action and claims for which they have a right to a jury trial on all issues of facts and damages.

## RELIEF SOUGHT

**WHEREFORE,** Plaintiffs requests relief as follows:

A. An order declaring that the actions of Defendants alleged in this complaint violate the NYCHRL;

B. An award of compensatory damages in an amount that would fully compensate Plaintiffs, plus prejudgment interest, for the economic loss, mental anguish, emotional pain and suffering, humiliation, embarrassment, emotional distress, feelings of paranoia and distrust, depression, low self-esteem, sleep deprivation, loss of enjoyment of life and interference with life's daily activities as well as continued stress and anxiety caused by Defendants' violations of the law alleged in this complaint, in an amount to be determined at trial;

C. An award of punitive damages to Plaintiffs in an amount that would punish Defendants for the willful, wanton, reckless misconduct alleged in this Complaint that would effectively deter Defendants from future discrimination and other unlawful behavior, in an amount to be determined at trial.

D. An award of all penalties available under the applicable laws;

E. An award of reasonable attorneys' fees, the fees and costs of experts, and the costs of this action; and

F. Such other relief as this Court deems just and equitable.

Dated: New York, New York
      February 21, 2023

Respectfully submitted,

*/S/ Kristina Mazzocchi*

By: Kristina Mazzocchi
*Attorney for Plaintiffs*

**The Law Office of Kristina Mazzocchi**
43 West 43rd Street, Suite 153
New York, NY 10036-7424
(t) 347-484-7413
kristina@mazzocchilaw.com

*/s/ Megan S. Goddard*

By: Megan S. Goddard
*Attorney for Plaintiffs*

**Goddard Law PLLC**
39 Broadway, Suite 1540
New York, NY 10006

(t) (646) 504-8363
megan@goddardlawnyc.com