UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

  LUIS DOMINGUEZ et al.,

                     Plaintiffs,          **MEMORANDUM & ORDER**
                                          23-CV-1372 (EK)(PCG)
             -against-

  MEGA MART LLC, d/b/a CHESTNUT
  SUPERMARKET et al.,

                     Defendants.

-------------------------------------x
ERIC KOMITEE, United States District Judge:

          Plaintiffs are former employees of Chestnut

Supermarket in Brooklyn.  They allege, among other things, that

the supermarket's managers sexually harassed them, discriminated

against them based on race, and violated federal, state, and

city wage-and-hour laws.  The market and its owner, defendant

Moshe Landau, have moved to dismiss the complaint in its

entirety.  ECF No. 45.  Two of the market's managers —

defendants Joel Epstein and Menachem Abramowitz — joined that

motion.  ECF No. 46.[1]  The moving defendants focus on plaintiffs'

federal claims, which are for (1) denial of overtime pay under

the Fair Labor Standards Act ("FLSA"); (2) racial discrimination

under 18 U.S.C. § 1981; (3) retaliation under Section 1981; and

(4) retaliation under the FLSA.  They also argue that the Court

---

          [1] Defendant Yechezkel Noiman has not appeared.

should decline supplemental jurisdiction over the state- and city-law claims.

For the following reasons, the motions to dismiss are granted in part and denied in part.

## I.    Background

The Court draws the following allegations from the second amended complaint.  ECF No. 52.  The allegations are presumed true for purposes of this motion.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[2]

### A.    The Parties

The plaintiffs are six former Chestnut employees: Luis Dominguez, Teodoro Moreno, Francisca Orduna, Emmanuel Quintana, Erasto Crisantos, and Flor Solis.  They began working at the store's Myrtle Avenue location at various times between January 2013 and the "[s]ummer of 2021."  Compl. ¶¶ 38-43.  The plaintiffs are Hispanic and, except for Dominguez (who hails from Ecuador), natives of Mexico.  *Id.*

Chestnut Supermarket is a "thriving Kosher retail chain supermarket" headquartered in Brooklyn.  *Id.* ¶¶ 44-45, 51-52.  Defendant Landau is the market's "[p]resident, founder, owner, and principal," while defendant Epstein is the store's general manager.  *Id.* ¶¶ 58, 72.  Defendant Noiman and defendant

---

[2] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

2

Laundau jointly own and operate a deli counter at the supermarket.  *Id.* ¶ 80.  Landau, Epstein, and Noiman jointly exercised "supervisory or managerial control" over the plaintiffs.  *Id.* ¶¶ 63, 73, 75, 85-86.  The complaint implies that defendant Abramowitz worked at Chestnut as a "[m]anager," *see, e.g., id.* ¶ 120, but never specifies his exact role or powers.

**B.    The Challenged Conduct**

The central incident in the complaint occurred on April 5, 2022.  The plaintiffs allege that Epstein locked three employees — Quintana, Crisantos, and Orduna — in his office, *id.* ¶¶ 193, 210, falsely accused them of stealing from a customer, *id.* ¶¶ 191, 197-98, 201-04, 209-11, forced them to take off their clothes, *id.* ¶¶ 188, 199, and assaulted and battered them. *Id.* ¶¶ 221-26.  The allegations can be chronologically divided into three parts: (1) allegations of workplace misconduct before the April 5 incident; (2) the April 5 incident; and (3) allegations of retaliation that occurred after the incident.

1.    Pre-April 2022 Conduct: Wage-and-Hour Allegations[3]

During their "entire tenure" at Chestnut, the plaintiffs worked overtime: "Dominguez worked approximately 45

---

[3] Dominguez left Chestnut in May 2022, so some of his allegations of workplace misconduct extend beyond April 2022.  For the sake of simplicity, the Court addresses them in this section.

hours a week" and as many as 70 hours per week during Jewish holidays, *id.* ¶¶ 114-15; "Moreno worked approximately 64 hours a week" and as many as 70 hours a week during Jewish holidays, *id.* ¶ 137; "Orduna worked approximately 55 hours a week," *id.* ¶ 148;[4] Crisantos "approximately 40-50 hours," *id.* ¶ 41; and Solis "approximately 90-115 hours," *id.* ¶ 105.[5]  They also allege that they were never provided wage statements or wage notices.  *Id.* ¶¶ 108, 116, 131, 139, 150.  And at least one of them (Dominguez) alleges that, rather than pay him in cash, Chestnut paid him with checks that "customers tendered to Chestnut to pay for their accounts . . . [and that] were not written to Plaintiff Dominguez."  *Id.* ¶¶ 123-25.

### 2.    Pre-April 2022 Conduct: Discrimination Allegations

Furthermore, all plaintiffs claim that defendants adopted racially discriminatory workplace practices.  For example, Dominguez, Quintana, and Crisantos allege that they were required to eat their lunch in the basement, while non-Hispanic employees were permitted to eat in the market itself.  *Id.* ¶¶ 167, 169.  Indeed, Dominguez alleges that when he tried to eat in the market in the summer of 2021, an unnamed manager

---

[4] Elsewhere, plaintiffs plead that Orduna worked "approximately 55-70 hours a week."  Compl. ¶ 40.  Whether this too was during Jewish holidays they do not say.  Regardless, plaintiffs allege that she worked at least 55 hours per week throughout her tenure at Chestnut.

[5] The complaint identifies most plaintiffs by two surnames, as is common, but then defines each plaintiff's name as indicated above.  This order follows the complaint's nomenclature.

threw his food in the garbage and screamed at him to go to the basement.  *Id.* ¶ 169.  Additionally, the complaint alleges that Epstein enforced an "English Only rule" that applied only to Hispanic employees, and once remarked to Orduna that he "hate[d]" it when she spoke in Spanish.  *Id.* ¶ 171.

Finally, plaintiffs allege that defendants sexually harassed them.  Epstein would allegedly "run his hands over [Orduna's and Solis's] bottoms when passing them," or ask them to give him massages.  *Id.* ¶¶ 172, 175.  Epstein and Abramowitz would also "make kissing gestures" toward Dominguez and grope his backside.  *Id.* ¶¶ 181-83.  Solis alleges that this harassment, combined with the alleged wage violations, resulted in her constructive discharge in July 2021.  *Id.* ¶ 111.

### 3.   The April 5 Incident

Come April 2022, every plaintiff except Solis was still working at Chestnut.  But the complaint alleges that on April 5, 2022, an incident occurred that resulted in Epstein firing Orduna and "constructively discharge[ing]" Crisantos, Quintana, and Moreno.  *Id.* ¶¶ 248-49, 253-55.

That afternoon, Abramowitz escorted Quintana to the store's management office, locking the door behind them.  *Id.* ¶¶ 186-88.  Epstein then shouted at Quintana, "Where is the money you stole?" *id.* ¶ 191, and demanded that Quintana strip off his clothes and turn his pockets inside out.  *Id.* ¶¶ 188, 190.  A

5

store employee then brought in Crisantos, who received the same treatment. *Id.* ¶¶ 197, 201. Epstein claimed that the two employees had conspired to steal $1,400 that Epstein had given to a female customer. *Id.* ¶ 203. According to Epstein, the customer left the money in the bathroom by mistake, and security footage showed that Cristanos and Quintana had been in the bathroom after the customer left the store. *Id.* ¶ 204.

Landau's son-in-law then escorted Orduna to the management office. *Id.* ¶¶ 208-10. Epstein demanded to know where the money was, and he ordered Orduna to undress in front of her male supervisors and co-workers. *Id.* ¶¶ 211, 213-14. Orduna refused, fearing she would "be beaten or raped." *Id.* ¶ 214. Epstein said that if the three plaintiffs did not cooperate, he could call the police or immigration authorities and have them deported. *Id.* ¶¶ 215-17. Orduna tried to record Epstein on her phone, but Epstein grabbed her wrist, pried the phone from her hands, and handed it to a store manager. *Id.* ¶¶ 219-26.

After screaming that the three plaintiffs were "nothing" and "rats," Epstein unlocked the door and let them leave. *Id.* ¶ 225. Orduna called the NYPD to report that "she was assaulted and falsely imprisoned" by the defendants. *Id.* ¶ 231. Before uniformed police arrived, three men arrived who identified themselves as police but were allegedly members of

6

the Shomrim ("a local neighborhood volunteer group").  *Id.* ¶¶ 9, 234.  Landau's son-in-law demanded that Orduna speak with the Shomrim, though Moreno insisted that he "leave her alone."  *Id.* ¶¶ 239-41.  Orduna eventually spoke with the Shomrim, who demanded that she accept money in exchange for "shut[ting] her mouth."  *Id.* ¶¶ 241-45.

Orduna refused to accept a payoff, and Epstein fired her.  *Id.* ¶¶ 249, 251. Epstein also screamed at Cristanos and Quintana to return to work, which they did not do.  Instead, when NYPD officers arrived, all three former employees gathered their belongings and left.  *Id.* ¶ 251.  The complaint alleges that both Crisantos and Quintana were constructively discharged, having been "falsely accused of crimes they did not commit, imprisoned[,] and threatened with deportation" by Epstein.  *Id.* ¶¶ 248, 251.  Although Epstein did not take any immediate action against Moreno, he too alleges he was constructively discharged because his challenge to the Shomrim "made him a target for the [d]efendants, and he knew that he was not safe at [Chestnut] anymore."  *Id.* ¶ 253.

4.  <u>Retaliation After April 2022</u>

Shortly after the incident, Epstein asked Dominguez — the sole plaintiff to remain at Chestnut — if he would "support the [s]tore" if its now-former employees filed a lawsuit.  *Id.* ¶ 259.  He responded that if "called to testify" he would say

that Epstein had touched Orduna in an aggressive way. *Id.*

¶¶ 263-67.  He was fired a week later. *Id.* ¶ 265.

According to the complaint, this firing was one of several retaliatory actions that defendants took to force the plaintiffs to drop their police complaints and / or lawsuit:

- In February 2023, plaintiffs' counsel "received an email from an attorney who held himself out to represent all Defendants but never filed a notice of appearance in this matter." *Id.* ¶ 286.  The sender allegedly threatened to file "a complaint against Plaintiffs in retaliation for filing the instant lawsuit." *Id.*

- Shortly after April 5, an "older Orthodox man who said he was sent by . . . Epstein" offered Orduna $50,000 to withdraw her police complaint. *Id.* ¶ 280.  During the remainder of April (and again in June), Orduna received "several" telephone calls and texts from Landau and Epstein asking to meet with her. *Id.* ¶ 280.

- In March 2023, shortly after a *New York Post* article about the filing of this lawsuit came out, Epstein told the NYPD that Dominguez had engaged in sexual misconduct in the store. *Id.* ¶¶ 291-92.  The resulting criminal case remains pending. *Id.* ¶ 291.

- Epstein filed a similar sexual harassment complaint against Crisantos, though the resulting case was dismissed for lack of evidence. *Id.* ¶¶ 303-07.

- In June 2023, Quintana was "repeatedly contacted by individuals . . . offering him his job back plus $3,000 if he would drop the lawsuit." *Id.* ¶¶ 294-97.

## II.  Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege sufficient facts, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is

8

plausible if the plaintiff pleads supporting facts that "allow[]
the court to draw the reasonable inference that the defendant is
liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "A
formulaic recitation of the elements of a cause of action" will
not suffice, nor will "naked assertions devoid of further
factual enhancement."  *Id.*  A reviewing court must "draw all
reasonable inferences in favor of the non-moving party."
*Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517
F.3d 104, 115 (2d Cir. 2008).

### III. Discussion

The defendants train their arguments on the four
federal claims.  The Court examines each in turn, before
addressing plaintiffs' argument that it should decline
supplemental jurisdiction over the state- and city-law claims.

### A.    The FLSA Overtime Claim[6]

The defendants first move to dismiss the FLSA overtime
claims brought by Dominguez, Moreno, Orduna, and Solis.  That
motion is denied, and the claims will proceed.

To bring an FLSA overtime claim, a plaintiff must
allege (1) "an employee-employer relationship," (2) work

---

[6] In their brief, plaintiffs state that their "FLSA claims arise under
29 U.S.C. §§ 206 and 207, which govern minimum wage and overtime
compensation."  Pls.' Opp'n 8, ECF No. 48.  But plaintiffs only pleaded a
claim under Section 207 (overtime), *see* Compl. ¶ 386, and they may not amend
their complaint in their opposition to the motion to dismiss.  *Wright v.
Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).

"involv[ing] some kind of interstate activity," and (3) "the hours worked for which [overtime] wages were not received." *Zhong v. August August Corp.*, 498 F. Supp. 2d 625, 628 (S.D.N.Y. 2007). The defendants argue that the second and third elements have not been satisfied. The Court disagrees.

    1.    Plaintiffs Have Plausibly Alleged That Chestnut <u>Is Covered Under the FLSA</u>

An enterprise is covered under the FLSA if it satisfies two criteria. First, its "annual gross volume of sales made or business done" must exceed $500,000, exclusive of "excise taxes at the retail level that are separately stated." *Jian Long Li v. Li Qin Zhao*, 35 F. Supp. 3d 300, 305 (E.D.N.Y. 2014) (citing 29 U.S.C. § 203(s)(1)(A)). Second, it must have "employees engaged in commerce or in the production of goods for commerce, or . . . employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person." *Id*. This latter criterion is "rarely difficult to establish," because it requires showing only that "two or more employees have handled . . . materials that have moved in . . . [interstate] commerce." *Jacobs v. N.Y. Foundling Hosp..*, 577 F.3d 93, 99 n.7 (2d Cir. 2009). Indeed, "virtually every enterprise in the nation . . . is covered by the FLSA." *Id*.

10

Plaintiffs have alleged that Chestnut's "annual gross volume of sales made or business done" exceeded $500,000. Compl. ¶ 51. This is enough at the pleading stage. *See, e.g., Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 33 (E.D.N.Y. 2015) (allegation that volume of business exceeded $500,000 sufficient even where complaint did not "provide[] any additional facts"); *Boutros v. JTC Painting and Decorating Corp.*, 989 F. Supp. 2d 281, 285 (S.D.N.Y. 2013) (same); *Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114, 121 (E.D.N.Y. 2011) (same).

Plaintiffs also plausibly plead that they handled goods that moved in or were produced for interstate commerce. They worked as stockers, cashiers, and / or deli counter employees. Compl. ¶¶ 98, 103, 112, 134, 146, 157. The conclusion readily follows that they "regularly handled" "food, beverage[s], and other commercial products." *Id.* ¶ 52. And the store was a "thriving Kosher retail chain supermarket" with an in-house deli and eating area. *Id.* ¶¶ 51, 80, 167. Courts in this district have found that similar businesses plausibly used goods that moved in interstate commerce. *See, e.g., Cardoza v. Mango King Farmers Mkt. Corp.*, No. 14-CV-3314, 2015 WL 5561033, at *4 (E.D.N.Y. Sept. 1, 2015), *report and recommendation adopted*, 2015 WL 5561180 (E.D.N.Y. Sept. 21, 2015) ("It is logical to infer that a supermarket's products and produce would

11

have originated outside of New York."); *Fermin*, 93 F. Supp. 3d at 33 (holding it was "reasonable to infer that the myriad goods necessary to operate a Peruvian restaurant . . . do not exclusively come from New York State").

2.    Plaintiffs Have Plausibly Alleged the Hours for Which They Did Not Receive Overtime Wages

An FLSA plaintiff bringing an overtime claim must "sufficiently allege [forty] hours of work in a given workweek as well as some uncompensated time in excess of the [forty] hours." *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013).  One way a plaintiff can satisfy this standard is by "alleg[ing] that their regularly scheduled workweek for a given period of time included more than forty hours of work, so that they were eligible for overtime during *every* week in which they worked their regular schedule." *Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 117 (2d Cir. 2023).  By contrast, *Lundy*'s "pleading standard is unmet if all that plaintiffs allege is that at *some* undefined period in their employment they worked more than forty hours in a single week." *Id.* at 117-18.

Dominguez, Moreno, Orduna, and Solis each meet this pleading standard.  All allege that they worked "excess" hours for which they did not receive overtime during their "entire tenure" at Chestnut.  Compl. ¶¶ 105, 114, 137, 148,  Dominguez

12

worked "approximately 45-70 hours a week," *id.* ¶¶ 38, 114-115; Moreno worked "approximately 64-70 hours a week," *id.* ¶¶ 39, 137; Orduna worked "approximately 55-70 hours a week," *id.* ¶¶ 40, 148; and Solis worked "approximately 90-115 hours a week," *id.* ¶¶ 43, 105.

Defendants insist that plaintiffs must allege the specific workweeks for which they were not paid overtime. Chestnut & Landau Br. 3, ECF No. 45-4.  The Second Circuit has squarely held otherwise.  It is certainly true that FLSA plaintiffs cannot simply allege that they worked more than forty hours "in some or all weeks," *Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 89 (2d Cir. 2013), or that they "regularly worked hours both under and in excess of forty per week," *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 199-201 (2d Cir. 2013).  Such allegations do not "support a reasonable inference that they worked more than forty hours in a *given* week."  *Id.* at 201 (emphasis added).  But here, the four FLSA overtime plaintiffs allege that they worked a range of hours *in excess of forty* during their *entire* tenure at Chestnut. That is sufficient.

In sum, Dominguez, Moreno, Orduna, and Solis have plausibly alleged FLSA overtime claims.

13

**B.    The Section 1981 Discrimination Claim**

Plaintiffs advance two theories of race discrimination under Section 1981: hostile work environment and disparate treatment.  *See Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015) (recognizing each theory under Section 1981). Defendants move (unsuccessfully) to dismiss both claims.

1.    Plaintiffs Have Alleged a Plausible Hostile Work Environment Claim

To plead a hostile work environment under Section 1981, a plaintiff must show that the defendant's conduct is (1) "objectively severe and pervasive," (2) "creates an environment that the plaintiff subjectively perceives as hostile and abusive," and (3) "creates such an environment because of the plaintiff's [race]."  *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (hostile work environment standard under Title VII); *see also Littlejohn*, 795 F.3d at 320 (same standard under Section 1981).  The parties do not dispute the second element, so we address only the first and third.

"[W]hether a particular work environment is objectively hostile is necessarily a fact-intensive inquiry." *Patane*, 508 F.3d at 114.  A court must "consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

14

unreasonably interferes with an employee's work performance."
*Littlejohn*, 795 F.3d at 321.

At this stage, the plaintiffs' allegations are sufficient. The complaint first alleges that defendants imposed an "English-only" policy on Hispanic employees. Compl. ¶¶ 77, 171. To be sure, "the enforcement of an English-only policy, in and of itself, does not constitute a hostile work environment on the basis of race." *Barbosa v. Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210, 220 (S.D.N.Y. 2010).[7] Here, however, the complaint alleges that the English-only rule was "applied only to Hispanics," suggesting that other employees were permitted to speak other languages. Compl. ¶ 171. This allegation may be relatively sparse, given that the complaint does not identify those other employees or other languages. But it suggests hostility more plausibly when combined with the allegation that Epstein told plaintiffs speaking Spanish that he "hate[d] that shit." *Id.*

---

[7] Plaintiffs invoke *Velasquez v. Goldwater Memorial Hospital*, 88 F. Supp. 2d 257 (S.D.N.Y. 2000) to argue that an English-only policy may give rise to a hostile work environment claim if the employer instituted the policy to discriminate against people of a specific national origin. Pl.'s Supp. Br. 2-3, ECF No. 53. But *Velasquez* was a Title VII case. And while Title VII proscribes national-origin discrimination, Section 1981 does not. *Amaya v. Ballyshear LLC*, 295 F. Supp. 3d 204, 223 (E.D.N.Y. 2018). Thus, *Velasquez* is inapposite. The plaintiffs also argue that policies prohibiting employees from conducting personal matters in their own language during non-working hours can give rise to a hostile work environment claim. Plaintiffs are correct. *See Levitant v. City of New York Human Res. Admin.*, 625 F. Supp. 2d 85, 99 (E.D.N.Y. 2008). But this point is irrelevant as well, because the complaint never alleges that the English-only policy was enforced during non-working hours.

The hostile-work-environment allegations gain force from the claim that defendants segregated the Chestnut lunch hour, forcing Hispanic employees to eat in the basement while permitting non-Hispanic employees to eat in the store itself. *Id.* at ¶¶ 167-69. Unsurprisingly, courts have consistently held that racially segregated workplace facilities will support a hostile work environment claim. *See, e.g.*, *Johnson v. Angels*, 125 F. Supp. 3d 562, 569 (M.D.N.C. 2015) (racially segregated bathrooms); *Firefighters Inst. for Racial Equality v. City of St. Louis*, 549 F.2d 506, 514-15 (8th Cir. 1977) (use of firehouse kitchen by racially segregated "supper club" of on-duty firefighters).[8]

Finally, plaintiffs allege that defendants threatened Quintana, Crisantos, and Orduna with deportation "back to Mexico" on at least one occasion (April 5). Compl. ¶¶ 7, 18, 215-17. These threats could have contributed to a work atmosphere permeated by fear and distrust between non-Hispanic employers and Hispanic employees. *See Tenecora v. Ba-Kal*

---

[8] Regardless of whether it is pleaded as a hostile work environment claim or some other claim under Section 1981 and / or Title VII, the "establishment and use" of segregated facilities "is [clearly] prohibited discrimination." 2 EEOC Compl. Man. § 618.1 ¶ 3401 (discussing the Commission's view under Title VII); *see also Hinds v. PSEG Long Island LLC*, No. 23-CV-08701, 2026 WL 266010, at *9 (E.D.N.Y. Feb. 2, 2026) (allegations that plaintiff was forced to work outside in the heat and use a "distant bathroom" while his "less senior, white, colleagues . . . were permitted to work inside and use a nearby bathroom" supported disparate treatment claim).

*Restaurant Grp.*, No. 18-CV-7311, 2021 WL 424364, at \*4-5 (E.D.N.Y. Feb. 8, 2021).

Thus, at this stage — taking the complaint as a whole — the plaintiffs have plausibly alleged racial harassment that would lead a reasonable employee to "find the conditions of her employment altered for the worse." *Patane*, 508 F.3d at 113.[9]

### 2. Plaintiffs Have Alleged a Plausible Disparate Treatment Claim

To plead a disparate treatment claim under Section 1981, a plaintiff must allege (1) "that she is a member of a protected class," (2) "that she was qualified for the position she [held]," (3) "that she suffered an adverse employment action," and (4) [that she] can sustain [the] *minimal* burden of showing facts suggesting an inference of discriminatory motivation." *Littlejohn*, 795 F.3d at 311-12. Defendants challenge only the first and fourth elements.

Defendants first argue that plaintiffs have failed to identify a "coherent protected class" of which they are members. Chestnut & Landau Br. 14. Specifically, defendants point to certain allegations of disparate treatment based on plaintiffs' national origin and immigrant and non-Jewish identities. *Id.*

---

[9] Plaintiffs cite *Cruz v. Coach Stores, Inc.*, 202 F.3d 560 (2d Cir. 2000) for the proposition that defendants' alleged sexual harassment should also factor into the hostile work environment analysis. Pls.' Br. 20-21, ECF No. 48. But *Cruz* was a Title VII case. And Section 1981 does not apply to sexual harassment. *Amaya*, 295 F. Supp. 3d at 223.

17

Regardless, plaintiffs have also plausibly alleged that they are members of a class protected under Section 1981 — people of Hispanic ethnicity, Compl. ¶ 404; *Vill. of Freeport v. Barrella*, 814 F.3d 594, 617 (2d Cir. 2016) (Hispanic ethnicity cognizable under Section 1981) — and that they faced discrimination on that basis.  *See, e.g.*, Compl. ¶¶ 13 (Hispanic employees assumed to be thieves), 77 (English-only rule applied only to Hispanic employees), 167-69 (both Mexican and Ecuadorian — but no non-Hispanic — employees sent to eat in basement).

Defendants also contend that plaintiffs have not pleaded allegations sufficient to support an inference of discriminatory intent because they have not provided sufficient "detail to compare the treatment of plaintiffs to those outside the protected class."  Chestnut & Landau Br. 17.  They are correct that a "plaintiff *may* demonstrate circumstances giving rise to an inference of discrimination by alleging that he was treated less favorably than similarly situated employees of other races," *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 229 (2d Cir. 2014), and that — to do so — the plaintiff must "identify at least one comparator."  *Sosa v. New York City Dep't of Educ.*, 368 F. Supp. 3d 489, 514 (E.D.N.Y. 2019) (collecting cases).  Defendants are also correct that, here, plaintiffs do not identify any specific comparator, instead offering conclusory

18

allegations that non-Hispanic employees were treated differently.  *E.g.*, Compl. ¶ 117.

But an inference of discrimination does not necessarily depend on allegations that employees outside the protected group were treated more favorably.  It can also "arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the sequence of events leading to the plaintiff's discharge."  *Littlejohn*, 795 F. 3d at 312.

Here, plaintiffs "allege a continuous, escalating pattern of conduct" that was "serious enough to constitute a hostile work environment[,] and finally culminated in" more concrete actions like certain plaintiffs being accused of theft and (constructively) terminated.  *Gregory v. Daly*, 243 F.3d 687, 697 (2d Cir. 2001), *as amended* (Apr. 20, 2001).  They also allege certain comments by Chestnut managers that could plausibly be construed as ethnically degrading.  For example, while questioning plaintiffs Orduna, Quintana, and Crisantos about the theft, Epstein told them, "You are rats!" — a "mantra" that plaintiffs had allegedly "heard many times before throughout their tenure."  Compl. ¶ 225.  And Epstein not only implemented an English-only policy that he only applied to Hispanic employees; he also explicitly told them, "Don't speak

19

Spanish. . . . I hate that shit." *Id.* ¶ 77. All told, those allegations are sufficient to meet the "minimal burden" at the motion to dismiss stage. *Littlejohn*, 795 F.3d at 311-12.

## C.   The FLSA Retaliation Claim

Next, defendants move to dismiss plaintiffs' retaliation claims under the FLSA. The Court concludes that the claims should proceed as to Quintana, Crisantos, and Dominguez. The remaining plaintiffs' FLSA retaliation claims are dismissed.

To state a claim for FLSA retaliation, a plaintiff must allege "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010).

### 1.   Participation in a Protected Activity

Under the FLSA, "protected activity" will be found in an employee complaint "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 107 (2d Cir. 2015).

Here, the plaintiffs point to three potential protected activities: the April 5 police report, Dominguez's stated intent to testify about the defendants' alleged wage

20

theft, and the decision to file the instant lawsuit.  *See* Compl. ¶ 231 (police complaint); ¶ 285 (Dominguez's intent to testify); ¶ 288 (filing of lawsuit).

The filing of the April 5 police report does not qualify as protected activity under the FLSA.  The complaint alleges no facts suggesting that Orduna mentioned any conduct proscribed by the FLSA.  Rather, Orduna allegedly reported that she had been "assaulted and falsely imprisoned" by the defendants.  *Id.* ¶ 231.  Bad behavior, to be sure, but not protected activity: as alleged, no employer would reasonably have understood this as an "assertion of rights protected by" or "a call for [the] protection" of the FLSA, rather than the criminal or common law.  *Greathouse*, 784 F.3d at 107.

Plaintiffs find more purchase, however, in the other two protected activities alleged.  Filing an FLSA lawsuit — as plaintiffs did here, Compl. ¶ 288 — is protected activity. *Mullins*, 626 F.3d at 54.  So is stating a clear intent to testify in an FLSA proceeding.  *Id.* ¶ 285 ("Defendants learned for the first time that [Dominguez] would testify . . . regarding wage theft."); *see Scalia v. Sarene Servs., Inc.*, 740 F. Supp. 3d 251, 290 (E.D.N.Y. 2024) (employees engage in protected activity when they are "reasonably anticipated to share information" with the Department of Labor as part of ongoing FLSA litigation); *cf. Uronis v. Cabot Oil & Gas Corp.*,

49 F.4th 263, 275 (3d Cir. 2022) (employee was engaged in protected activity when employer was aware he was a "putative [FLSA] collective member"). Accordingly, every plaintiff has alleged participation in at least one (and in Dominguez's case, two) protected activities under the FLSA.

2. FLSA-Driven Adverse Employment Action

A plaintiff bringing an FLSA retaliation claim must also plead "an employment action disadvantaging the plaintiff; and . . . a causal connection between the protected activity and the adverse employment action." *Mullins*, 626 F.3d at 53. "An employment action disadvantages an employee if it well might have dissuaded a reasonable worker from making or supporting similar charges" under the FLSA. *Id.*

The term "employment action" is somewhat misleading, however, because an employer can also be liable for retaliation that occurs after a plaintiff's employment has ended. The Supreme Court has squarely held that Title VII's antiretaliation provision covers former employees. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). And because the Second Circuit applies the same standard for retaliation under the FLSA as it does under Title VII, *see, e.g.*, *Scalia*, 740 F. Supp. 3d at 282 (citing *Mullins*, 626 F.3d at 53), courts in this circuit have extended *Robinson* to the FLSA retaliation context. *See, e.g.*,

*Li v. Oliver King Ents., Inc.*, No. 14-CV-9293, 2015 WL 4643145, at *3 (S.D.N.Y. Aug. 4, 2015) (collecting cases).

But the "scope of [actionable] post-employment conduct that does not have a direct connection to the former employee's employment prospects [is] . . . relatively narrow." *Id.* at *3; *see also Alvarado v. GC Dealer Servs. Inc.*, 511 F. Supp. 3d 321, 359 (E.D.N.Y. 2021).[10] Courts in this circuit have consistently recognized only two other forms of actionable post-employment retaliation under the FLSA: filing "bad faith litigation" against former employees, and threatening to report former employees to immigration authorities. *Porter v. MooreGroup Corp.*, No. 17-CV-7405, 2020 WL 32434, at *11 (E.D.N.Y. Jan. 2, 2020) (collecting cases).

a. Solis, Moreno, and Orduna Do Not Plausibly Allege an Adverse Employment Action

Three plaintiffs allege either no retaliatory action, or retaliatory actions that fall outside the "relatively narrow" range of proscribed conduct. Solis and Moreno do not allege any specific retaliatory action at all. Meanwhile, Orduna alleges that she received "several unwanted and unanswered" calls from

---

[10] The court in *Alvarado* was analyzing a retaliation claim under the New York Labor Law ("NYLL"). But NYLL and FLSA claims "are analyzed using the same standards at the pleading stage." *Rosenbaum v. Meir*, 658 F. Supp. 3d 140, 150 (E.D.N.Y. 2023).

Epstein and Landau between April and June 2022, even after plaintiffs' counsel asked them to stop.[11]  Compl. ¶¶ 280-84.

The alleged phone calls do not qualify as adverse employment actions.  Orduna never alleges that the calls or messages even mentioned the instant lawsuit.  Thus, it is unclear that the calls were connected to a protected activity under the FLSA.  But leaving that complication aside, Orduna identifies no authority suggesting that repeated calls or text messages — without more — qualify as actionable retaliation under the FLSA.  Nor does she distinguish cases that suggest otherwise.  *See, e.g.*, *Santos v. ET&K Foods, Inc.*, No. 16-CV-7107, 2017 WL 9256490, at *5 (E.D.N.Y. June 27, 2017) (allegation that defendants called plaintiff ten times before plaintiff filed her complaint insufficient to plead FLSA retaliation); *Jian Zhong Li*, 2015 WL 4643145, at *4 (allegation that defendant "made a series of telephone calls and sent several text messages to Plaintiff before visiting the vicinity of Plaintiff's home without invitation" insufficient to plead retaliation claim).  Thus, the alleged unwanted calls and messages to Orduna do not constitute adverse employment action under the FLSA.

---

[11]  Orduna also alleges that an unnamed man offered her $50,000 to withdraw her police complaint.  *See* Compl. ¶ 280.  But as already noted, Orduna's filing of the police complaint was not protected by the FLSA.

Finally, the complaint also makes two broad allegations about adverse employment actions suffered by *every* plaintiff, which are also insufficient.  First, plaintiffs allege that an attorney claiming to represent the defendants emailed their counsel and said he would file a retaliatory lawsuit if this lawsuit went ahead.  Compl. ¶ 286.  Plaintiffs' counsel did not attach this email to the complaint, so the Court cannot determine whether its language is "also susceptible of an alternative [non-retaliatory] reading."  *Khurana v. Wahed Invest, LLC*, No. 18-CV-233, 2019 WL 1430433, at *16 (S.D.N.Y. Feb. 26, 2019), *report and recommendation adopted*, 2019 WL 1432589 (S.D.N.Y. Mar. 29, 2019) (declining to find email to plaintiff's counsel was plausibly retaliatory under NYLL where full text not provided).  More importantly, plaintiffs never allege that defendants *actually* initiated retaliatory litigation.  Second, the complaint claims that every plaintiff was "harass[ed] . . . in person, via phone, electronic communication, [and] through intermediaries."  Compl. ¶ 412.  This allegation is insufficient for the reasons discussed above.

b. Dominguez, Crisantos, and Quintana Plausibly
   Allege an Adverse Employment Action

Three other plaintiffs, however, do plead adverse employment actions that support their FLSA retaliation claims.

Both Dominguez and Crisantos allege that the defendants filed baseless police reports accusing them of sexual harassment as retaliation for the instant lawsuit. Dominguez alleges that in March 2023, three days after the *New York Post* published an article about the initial complaint in this case, the defendants called the NYPD and accused him of engaging in "sexual misconduct" at the store beginning in June 2022. *Id.* ¶¶ 289-93. Similarly, Crisantos alleges that after he refused to drop this lawsuit near the end of 2023, Epstein contacted the NYPD and accused him of sexual assault. *Id.* at ¶¶ 301-03. The criminal case against Crisantos has been dismissed for insufficient evidence, while the case against Dominguez is still pending. *Id.* at ¶¶ 291, 303.

As already noted, filing or initiating baseless legal actions against a former employee can qualify as post-employment retaliation. *See Rodriguez v. Nat'l Golf Links of Am.*, No. 19-CV-7052, 2020 WL 3051559, at *4 (E.D.N.Y. June 8, 2020) (collecting cases). "To sustain a claim of retaliation based on the filing of a lawsuit or counterclaim, the plaintiff must allege both that the lawsuit or counterclaim was

26

filed . . . with a retaliatory motive and that it was filed without a reasonable basis in fact or law." *Kim v. Lee*, 576 F. Supp. 3d 14, 31 (S.D.N.Y. 2021).[12]

Dominguez's allegations satisfy this two-part standard. Dominguez alleges that Epstein contacted the police mere days after the complaint in this case was filed, Compl. ¶¶ 289-90, and that temporal nexus makes it plausible that the complaint was filed with a retaliatory motive. *Cf. Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 92 (2d Cir. 2015) (plaintiff sufficiently alleged Title VII retaliation based on two-month gap between protected conduct and alleged adverse employment action). Moreover, Dominguez plausibly alleges that Epstein's complaint "lacked a reasonable basis in fact." *Kim*, 576 F. Supp. 3d at 31. Epstein claims that Dominguez began sexually harassing people in June 2022 — one month *after* Dominguez was fired. *See* Compl. ¶¶ 38, 290. Thus, Dominguez has plausibly alleged that Epstein's police report — and the criminal case it initiated — was both retaliatory and frivolous.

Crisantos' allegations also satisfy the standard outlined in *Kim*. The complaint against Crisantos was filed

---

[12] Not all courts have adopted this two-part standard. They are split on whether a retaliatory lawsuit must also be frivolous to fall within the ambit of the FLSA's anti-retaliation provision. *See Soto v. Miss Laser Inc.*, No. 19-CV-4745, 2021 WL 7287304, at *5-6 (E.D.N.Y. Mar. 16, 2021) (collecting cases on both sides). And the Second Circuit has not resolved this split. Kim, 2023 WL 2317248, at *3 n.5. However, the allegations in this case are sufficient even under the stricter two-part standard.

27

within weeks of him declining to drop this lawsuit.  Again, this temporal proximity makes it plausible that the complaint was retaliatory.  *See Vega*, 801 F.3d at 92.  And the criminal case against Crisantos was ultimately dropped for lack of evidence, which makes it plausible that it lacked a reasonable basis in fact or law.  *See Nunez v. Metro. Learning Inst., Inc.*, No. 18-CV-1757, 2019 WL 5457731, at *2 (E.D.N.Y. Oct. 24, 2019) ("The dismissal of [a] state court action, at the very least, makes it plausible that the lawsuit was baseless.").

As for Quintana, he alleges that four months after this lawsuit was filed, both Epstein and men alleged to be his agents approached him at his home and "pressured and threatened" him to drop this suit.  Compl. ¶¶ 297, 299.  Though these allegations are somewhat thin, the Court cannot say at this stage that it is implausible that such behavior would dissuade a reasonable employee in Quintana's position from pursuing his FLSA rights.  *Stih v. Rockaway Farmers Mkt., Inc.*, No. 22-CV-3228, 2023 WL 2760492, at *6 (E.D.N.Y. Apr. 3, 2023).

In sum, the FLSA retaliation claims brought by Dominguez, Crisantos, and Quintana may proceed, while the claims brought by the remaining plaintiffs must be dismissed.

28

**D.   The Section 1981 Retaliation Claim**

Defendants also move to dismiss plaintiffs' retaliation claims under Section 1981.  Here, the Court agrees, except as to Crisantos.

The elements of a retaliation claim under Section 1981 are the same as those under the FLSA: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Littlejohn*, 795 F. 3d 297, 316; *see also id.* at 315 (Section 1981 retaliation claims are "analyzed pursuant to Title VII principles and the *McDonnell Douglas* burden-shifting evidentiary framework.").  But whereas retaliation is cognizable under the FLSA when it is in response to a plaintiff's attempt to seek the FLSA's protections, "retaliation claims are . . . cognizable under § 1981 where the allegations provoking the retaliation involved racial discrimination."  *Moore v. Consol. Edison Co.*, 409 F.3d 506, 508 n.2 (2d Cir. 2005).

Plaintiffs never allege that they complained about racial discrimination at any point before filing their first amended complaint in August 2023.  ECF No. 32; *see Albert v. Carovano*, 851 F.2d 561, 571-72 (2d Cir. 1988) (Section 1981 applies only to racial discrimination).  And the only

29

retaliatory action — as described in the preceding section — that postdates the filing of the amended complaint is Epstein's complaint against Cristanos for sexual harassment.

Accordingly, Crisantos' Section 1981 retaliation claim may proceed, but the other plaintiffs' claims are dismissed.

### E.    Supplemental Jurisdiction

Along with their four federal claims, the plaintiffs have lodged twenty more claims under state and city law.  Compl. ¶¶ 308-428.  The Court may only exercise supplemental jurisdiction over those claims if they share a "common nucleus of operative fact" with the federal claims that remain part of this action.  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).  To determine if this standard has been satisfied, the Second Circuit asks "whether the facts underlying the federal and state claims substantially overlapped . . . or the federal claim necessarily brought the facts underlying the state claim before the court."  *Achtman v. Kirby, McInerney & Squire LLP*, 464 F.3d 328, 335 (2d Cir. 2006).

The Court will exercise supplemental jurisdiction over most of the non-federal claims.  Plaintiffs' state labor law claims and federal labor law claims "clearly derive from . . . a common nucleus of operative fact."  *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011); *but see Benitez v. Valentino U.S.A., Inc.*, No. 19-CV-11463, 2024

30

WL 5145564, at *2 (S.D.N.Y. Dec. 17, 2024) ("[C]ourts have consistently held that there is no supplemental jurisdiction over state law *employment discrimination claims* when the only common nucleus with the FLSA claim is the existence of a common employment relationship." (emphasis added)).  So too do their state- and city-law claims for retaliation and malicious prosecution.  *See, e.g.*, *Dervisevic v. Wolfgang's Steakhouse, Inc.*, No. 19-CV-814, 2019 WL 6251197, at *4 (S.D.N.Y. Nov. 22, 2019) ("FLSA retaliation claim provides supplemental jurisdiction for . . . state retaliation claims").  And their state-law claims for race discrimination and retaliation, and city-law claims for discrimination based on immigration status and national origin share a common nucleus of operative fact with their federal discrimination claims.  *McPherson v. NYP Holdings, Inc.*, No. 03-CV-4517, 2005 WL 2129172, at *9 (E.D.N.Y. Sept. 1, 2005) (state pay discrimination claims share common nucleus of operative fact with Section 1981 claim); *see also* Section III.B.1, *supra* (discussing allegations that might evince race, immigration, and / or national-origin discrimination). Even plaintiffs' various tort claims and their claim under the New York City Gender Motivated Violence Act share a common nucleus of fact with the federal claims because they arise from the events of April 5, 2022.  *Achtman*, 464 F.3d at 335 (question is whether the *facts* "substantially overlapped").

31

But plaintiffs' state-law claims for sexual harassment (Claims 7 and 8) do not share a common nucleus of operative fact with the federal claims.[13]  Section 1981 does not proscribe discrimination based on sex.  *Minto v. Molloy Univ.*, 715 F. Supp. 3d 422, 429 (E.D.N.Y. 2024).  As for the FLSA claims, "it is well-established that federal wage-and-hour claims . . . are, in general, factually distinct from state discrimination claims."  *Dervisevic*, 2019 WL 6251197, at *2 (collecting cases).  And the mere fact that the sexual harassment and wage-and-hour claims arise out of the same employment relationship is insufficient to justify supplemental jurisdiction.  *See Shibetti v. Z Restaurant, Diner & Lounge, Inc.*, 478 F. Supp. 3d 403, 408-11 (E.D.N.Y.) (employment relationship alone is insufficient to establish common nucleus of fact between FLSA and state sexual harassment claims); *see also* 13D Charles Wright & Arthur Miller, *Federal Practice & Procedure* § 3567.1 (3d ed.) (similar).  Claims 7 and 8 are therefore dismissed.[14]

---

[13] Plaintiffs also bring a claim for negligent hiring, training, and supervision (Claim 9) against Chestnut.  Plaintiffs may not proceed on that claim to the extent that the allegedly negligent supervision relates to their allegations of sexual harassment.

[14] Defendants also argue, in passing, that the Court should exercise its discretion under 28 U.S.C. § 1367(c)(2) to decline supplemental jurisdiction over the state and local claims because they "predominate" over the federal claims.  Chestnut & Landau Br. 24-25.  But as discussed above, many (if not all) of the state- and local-law claims parallel plaintiffs' federal claims, meaning they do not predominate.  *Cf. Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 247 (2d Cir. 2011) (where "the state law claims essentially replicate the FLSA claims . . . they plainly do not predominate").

## F.    Wage Notice and Wage Statement Claims

No defendant has questioned plaintiffs' standing to bring their NYLL wage statement or wage notice claims.  Because the issue implicates its subject-matter jurisdiction, however, the Court has an affirmative obligation to evaluate whether standing exists as to each of plaintiffs' claims.  *E.g., DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006).

Numerous courts in the Second Circuit have concluded that employees lacked standing to bring a NYLL wage statement and wage notice claim when they failed to allege any concrete injury traceable to such a violation.  *See Choi v. SD Tools, Inc.*, No. 19-CV-2008, 2024 WL 4989224, at *16 (E.D.N.Y. Dec. 5, 2024) (collecting cases).  "[T]echnical violations of the Labor Law" are not enough; rather, a plaintiff "must allege actual injuries suffered as a result of the alleged wage notice and wage statement violation."  *Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300, 305 (2d Cir. 2024).  Accordingly, plaintiffs will be ordered to show cause why these claims should not be dismissed for lack of subject-matter jurisdiction.

## G.    Defendant Abramowitz

Abramowitz contends that, even if the motions to dismiss are otherwise denied, he should be dismissed from this action.  Epstein & Abramowitz Br. 2, ECF No. 46-3.  Abramowitz argues that "[s]pecific alleged acts he committed are mentioned

33

only in connection with" the sexual harassment claims and claim for intentional infliction of emotional distress ("IIED") during the April 5 incident. *Id.* The sexual harassment claims are dismissed herein. *See* Section III.E, *supra*. And his alleged involvement in the April 5 incident is limited to accompanying Quintana to the manager's office, where he was then detained. Compl. ¶ 186. That allegation, on its own, is insufficient to support a claim for IIED. *See Novak v. Sisters of Heart of Mary*, 210 A.D.3d 1104, 1106 (2d Dep't 2022) ("The elements of intentional infliction of emotional distress are (1) extreme and outrageous conduct; (2) the intent to cause, or the disregard of a substantial likelihood of causing, severe emotional distress; (3) causation; and (4) severe emotional distress.").

Plaintiffs counter that Abramowitz is "directly implicated in [their] FLSA overtime claims" because they allege that Dominguez complained to Abramowitz and others about his insufficient pay and they "would always say [they] couldn't help him." Pls.' Opp'n 2 n.3. But plaintiffs did not plead an FLSA overtime claim against Abramowitz. *See* Compl. ¶¶ 384-87. They do plead an FLSA retaliation claim against Abramowitz, but the only possible factual allegation to support that claim is that he was *in the room* while Epstein intimidated Dominguez. *Id.* ¶ 257. Accordingly, Abramowitz is dismissed from this action.

## IV.  Conclusion

For the foregoing reasons, the motions to dismiss are granted in part and denied in part.  Only Crisantos' claim for retaliation under Section 1981 (Claim 21) and Cristanos, Quintana, and Dominguez's claims for retaliation under the FLSA (Claim 23) may proceed.  And the Court declines to exercise supplemental jurisdiction over plaintiffs' state-law sexual harassment claims (Claims 7 and 8).  Defendant Abramowitz is also dismissed from this action entirely.  The remaining claims may proceed.

Plaintiffs are also ordered to show cause by April 15 why their NYLL wage notice and wage statement claims should not be dismissed for lack of subject-matter jurisdiction.  Plaintiffs' submission should not exceed 750 words.


SO ORDERED.



  /s/ Eric Komitee
ERIC KOMITEE
United States District Judge


Dated:    March 30, 2026
          Brooklyn, New York

35